# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2010-NMSC-041**

**Filing Date: August 9, 2010**

**Docket No. 31,319**

**STATE OF NEW MEXICO,**

   **Plaintiff-Appellee,**

**v.**

**CLEO JUAN,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY**
**Grant L. Foutz, District Judge**

Fine Law Firm
Mark D. Fine
Joseph M. Fine
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**MAES, Justice.**

**{1}** Cleo Juan (Defendant) directly appeals her conviction for child abuse resulting in the death of a child under twelve years of age contrary to NMSA 1978, Section 30-6-1(D) (1973, prior to 2009 amendment), alleging that the trial court erred by (1) failing to provide an answer to the jury's question regarding the option of "hanging," (2) denying Defendant's request for a lesser included offense instruction on child abuse not resulting in the death of a child, (3) failing to disqualify the Eleventh Judicial District Attorney's office after

1

discovering the alleged familial relationship between the District Attorney and Defendant, and (4) failing to consider mitigating evidence pursuant to NMSA 1978, Section 31-18-15.1 (1979, prior to 2009 amendment), which grants the trial court discretion to alter the basic sentence for noncapital offenses in light of mitigating or aggravating circumstances. We conclude that (1) the trial court's improper failure to answer the jury's question regarding the option of hanging had a coercive effect upon the jury, (2) Defendant presented insufficient evidence to support a lesser included offense instruction on child abuse not resulting in death, (3) the trial court did not abuse its discretion in determining that Defendant's familial relationship with the District Attorney did not create a personal bias that warranted disqualification, and (4) the trial court had the discretion under Section 31-18-15.1 to alter Defendant's basic sentence of life imprisonment. Accordingly, we reverse Defendant's conviction and remand for a new trial.

## I.  FACTS AND PROCEDURAL HISTORY

**{2}**     We begin with a summary of the facts that the jury reasonably could have found on the basis of the evidence adduced at trial. Additional facts will be set forth as necessary to address Defendant's claims on appeal.

**{3}**     Emergency medical technicians (EMT) and Officer Christopher Dale responded to a 911 call reporting that an infant had stopped breathing. The infant was twenty-one-month-old Colby Shirley (Baby Colby), who was in the care of Defendant, his foster mother. When the EMT and Officer Dale arrived at Defendant's mobile home in Gallup, New Mexico, Defendant was performing cardiopulmonary resuscitation (CPR) on Baby Colby, who was lying on the living room floor unable to breath. Defendant told the EMT that she had found Baby Colby floating face down in the bathtub and that he might have slipped in the tub. Baby Colby was admitted to the University of New Mexico Hospital (UNMH), where he died six days later, on March 20, 2006.

**{4}**     Defendant was charged by criminal information with child abuse resulting in the death of a child under twelve years of age contrary to Section 30-6-1(D)(1) or (2). At trial, the prosecution called Dr. Mark R. Crowley, Baby Colby's attending physician in the Pediatric Intensive Care Unit at UNMH, to testify. He testified that, based on several x-rays, computerized axial tomography scans (CT scans), and magnetic resonance imaging (MRI), he discovered that Baby Colby had several subdural hematomas. Dr. Crowley stated that a subdural hematoma occurs as a result of significant trauma to the brain that tears the blood vessels connecting the brain and the dura, the brain's covering. According to Dr. Crowley, this injury is the product of an acceleration-deceleration injury involving "vigorous shaking of the child or moving of the child's body back and forth, and the head lags behind, and . . . kind of snaps back and forth. . . . [W]hen the head stops, the brain keeps going inside the skull, and mashes into the back of the skull, and then vice versa." Since there were multiple subdural hematomas at different stages of healing, Dr. Crowley concluded that these injuries occurred on different occasions. Baby Colby also had retinal hemorrhages, which occur when blood vessels in the eye break due to significant trauma.

2

**{5}** Dr. Crowley's conclusions were consistent with those of Dr. Michelle Barry, the forensic pathologist who supervised the autopsy of Baby Colby and who testified at trial. Dr. Barry testified that in the course of the autopsy she found retinal hemorrhages inside both of Baby Colby's eyes, which were notable "because it takes a lot of force for those to occur." She also discovered that Baby Colby had sustained two head injuries that had occurred at different times and concluded that these injuries were the result of child abuse. She further concluded that the cause of Baby Colby's death was "blunt force injuries [to] the head, and the manner of death [was] homicide."

**{6}** In addition to Dr. Crowley and Dr. Barry, the prosecution called three other expert witnesses: Dr. Karen Campbell, a pediatrician employed by the Children, Youth, and Families Department (CYFD); Dr. Blaine Hart, a radiologist at UNMH; and Dr. Ken Stewart, an emergency medicine physician. The experts agreed that Baby Colby's death was the result of significant head trauma, likely resulting from forceful shaking. They also agreed that none of the scenarios that Defendant described to the EMT explained Baby Colby's head trauma.

**{7}** The prosecution also called the lead investigator in the case, Detective Juan Reyes, who had interviewed Defendant and obtained her signed written statement. During the Detective's interview of Defendant, which was read to the jury, Defendant told him that Baby Colby had fallen on a small yellow toy bus and possibly hit his head. Defendant also described that when she was bathing Baby Colby, his nose began to bleed and he kept slouching toward the end of the tub. She claimed that she took Baby Colby to the living room, and while she was in the bedroom getting his clothes, he stopped breathing. Later in the interview she described another incident in which she pulled off Baby Colby's pants "a little too hard, and he kind of fell back on his head."

**{8}** In her written statement, which was also read to the jury during trial, Defendant wrote:

> I regret everything I did. I wish I could turn back everything. And just wished I would have just changed their clothes.
>
> . . . .
>
> I am so upset with myself. I wish – no, I don't wish I would take Colby's place, and not have him suffer. I take the pain for him. Without thinking twice. I became a foster parent to take in abused children. And nurture them. But I have done the most unimaginable thing to a child. An innocent child who trusted me.
>
> . . . .

3

I have no excuse for what I have done.

She also admitted that she had been having trouble handling the foster children in her care and had made numerous requests to CYFD to remove the foster children from her home but did not receive a response. In addition, she disclosed that she was on anti-depression medication, which she had not been consistently taking. When Detective Reyes asked during the interview what effect not taking her medications usually has on her, she stated that she becomes agitated and mad.

**{9}** At trial, Defendant sought to prove that her husband had shaken Baby Colby, asserting that on the morning of the incident her husband was alone with Baby Colby, and when she returned home Baby Colby was acting strangely. Defendant relied on the statements of expert witnesses at trial to prove that when a child receives significant brain injuries the child will immediately begin to act abnormally. The experts stated that the immediate symptoms of the injury could include lethargy, a withdrawn disposition, lack of appetite, lack of focus, and irritability. Defendant called her brother, David Smith, to testify that Baby Colby's behavioral changes had already begun when he and Defendant arrived at the mobile home the morning that Baby Colby lost consciousness. Defendant's brother stated that during breakfast Baby Colby was "stiff . . . like a doll," seemed to be in a daze, and hardly ate anything.

**{10}** Defendant was found guilty of child abuse resulting in the death of a child under twelve years of age. In accordance with NMSA 1978, Section 31-18-15(A)(1) (1977, prior to 2007 amendments), Defendant received a life sentence followed by five years of parole. Defendant appeals her conviction pursuant to Rule 12-102(A)(1) NMRA and Article VI, Section 2 of the New Mexico Constitution, which provide for direct appeals from the district court when a sentence of death or life imprisonment has been imposed. On appeal, Defendant raises four issues: (1) that the trial court erred in failing to answer the jury's question about the option of "hanging," (2) that she was entitled to a lesser included offense instruction on child abuse not resulting in death, (3) that the district attorney's office should have been disqualified as a result of an alleged familial relationship between the District Attorney and Defendant, and (4) that the trial court erred in ruling that it did not have discretion to adjust Defendant's life sentence under Section 31-18-15.1.

## II.    DISCUSSION

### A.    Whether the Trial Court Erred in Failing to Answer the Jury's Question Regarding the Option of "Hanging"

**{11}** At the close of evidence, the trial court issued the following relevant jury instructions:

>     In this case, there are two possible verdicts as to this crime. One, guilty, and two, not guilty. Only one of the possible verdicts may be signed

4

by you as to each charge. If you have agreed upon one verdict as to a particular charge, that form of verdict is the only form to be signed as to that charge. The other form of verdict as to that charge is to be left unsigned.

. . . .

. . . Your verdict must represent the considered . . . judgment of each juror. In order to return a verdict it is necessary that each juror agrees. Your verdict must be unanimous. It is your duty to consult with one another, and try to reach an agreement. However, you are not required to give up your individual judgment. Each of you must decide the case for yourself, but you must do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own view, and change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or [effect] of evidence solely because of the opinion of your fellow jurors, or for the purpose of reaching a verdict. You are judges. Judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

*See* UJI 14-6010 NMRA (general verdict form); UJI 14-6008 NMRA ("Duty to consult").

**{12}** The jury commenced its deliberations at approximately 4:00 p.m. on a Friday afternoon. The jury submitted various questions to the court throughout its deliberations. At 6:17 p.m. the jury asked the trial court "how long [it] wanted [the jury] to continue" with its deliberations. The trial court responded, "I'm gonna leave that up to you. Do you wanna quit now, and come back tomorrow? Come back Monday? Tell me what you'd like to do. Or do you wanna deliberate some more this evening?" The jury informed the trial court that "by consensus, it is the feeling of the jury to stay to try to finish this tonight."

**{13}** At approximately 7:30 p.m. the jury submitted the following question to the trial court: "[I]s a non-verdict or a hung jury an option? It isn't according to instruction number seven [UJI 14-6010]?" Defendant requested that the jury be instructed that it had the option of not reaching a verdict, and the State suggested that the jury be told to rely on the written instructions the court had provided. The trial court indicated that it would not "answer this right now. [It was] gonna let it sit for a little bit." Defense counsel responded that it is "almost like saying it's not an option." The trial court explained that a delay in responding is "not answering it one way or the other. . . . [T]hey've only been in there for four hours. Not even four . . . ."

**{14}** At 9:48 p.m., approximately two hours and fifteen minutes later, the jury returned with a guilty verdict. The trial court never responded to the jury's question regarding the option of hanging, even though the trial court had promptly responded to all other inquiries submitted by the jury throughout the evening.

5

**{15}**   Defendant argues on appeal that the trial court erred when it refused to inform the jury that it had the option of hanging.  In the absence of a response from the trial court, Defendant claims that the jury may have concluded that it was not permitted to hang and therefore rendered a verdict based on a fear or misunderstanding that it would be forced to deliberate ad infinitum.  The State responds that the jury never indicated that it was deadlocked or could not reach a verdict but merely asked for clarification on the verdict form.  The State additionally argues that the trial court's failure to respond to the jury's question did not have a coercive effect on the jury.

**{16}**   The decision to issue additional jury instructions generally lies within the sound discretion of the trial court.  *State v. Moore*, 42 N.M. 135, 143, 76 P.2d 19, 23 (1938).  However, when a jury requests clarification regarding the legal principles governing a case, the trial court has a duty to respond promptly and completely to the jury's inquiry.  *See Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946) ("When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."); *United States v. Duran*, 133 F.3d 1324, 1334 (10th Cir. 1998) ("[W]hen a jury indicates through its queries that it is confused as to important legal standards in a case, particularly where there is an apparent basis for the confusion, it is plain error for the district court not to clarify that confusion."); *Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987) ("[W]here a jury shows confusion about a central aspect of applicable law, and the general instruction did not provide the legal information needed, reversible error occurs when the court does not respond to the jury's note.").

**{17}**   Moreover, this Court has recognized that "when a statement is submitted to the court by the jury during deliberations concerning the inability of the jury to arrive at a verdict, together with a disclosure of the numerical division, the judge *must* communicate with that jury in some fashion."  *State v. McCarter*, 93 N.M. 708, 710, 604 P.2d 1242, 1244 (1980) (emphasis added); *see also State v. Laney*, 2003-NMCA-144, ¶ 52, 134 N.M. 648, 81 P.3d 591 ("[W]hen a jury communicates with the district court during deliberations and expresses its inability to arrive at a verdict, 'the judge *must* communicate with that jury in some fashion.'" (quoting *State v. Neely*, 112 N.M. 702, 712, 819 P.2d 249, 259 (1991)).  Although the trial court is prohibited from issuing a "shotgun" instruction, which instructs the jury that it *must* deliberate further, the trial court is permitted to "inform the jury that it *may* consider further deliberations."  *McCarter*, 93 N.M. at 710, 604 P.2d at 1244; *see also* UJI 14-6008 use note ("After the jury has retired for deliberation neither this instruction nor any 'shotgun' instruction shall be given."); UJI 14-6030 NMRA use note (indicating that a shotgun instruction should not be given to the jury).

**{18}**   We recognize that, in this case, the jury did not report that it was deadlocked or reveal the status of its deliberations in terms of a numerical division.  Nonetheless, the jury plainly was confused by the trial court's instructions on the law and requested clarification with respect to whether "a non-verdict or a hung jury [was] an option" under UJI 14-6010, which instructed the jury that there were only two possible verdicts—guilty or not guilty.  This note revealed that (1) the jury was having difficulty arriving at a unanimous verdict, and

6

(2) the jury was under the mistaken impression that it was required to continue its deliberations indefinitely until a unanimous verdict was achieved. Under these circumstances, the trial court had a mandatory duty to clarify the apparent confusion and to inform the jury that it may cease its deliberations and not arrive at a unanimous verdict if it was indeed deadlocked. Such an instruction is consistent with *McCarter* and its progeny because it permits, but does not require, the jury to continue its deliberations.

**{19}** Nonetheless, a new trial is required only if the trial court's failure to issue a supplementary instruction coerced the jury into arriving at a verdict. *See State v. Rickerson*, 95 N.M. 666, 668, 625 P.2d 1183, 1185 (1981) (noting that inquiries into the numerical division of the jury "are reversible error only when shown to have a coercive effect on the jury"); *McCarter*, 93 N.M. at 711, 604 P.2d at 1245 (holding that a coerced jury verdict "violates due process because it impinges on the right to a fair and impartial trial."); *Laney*, 2003-NMCA-144, ¶ 56 ("[I]n determining whether the jury was coerced to arrive at a verdict, the actions as well as the circumstances under which the court's actions arose should be considered."). The record reveals that the jury submitted its question regarding the option of hanging at approximately 7:30 p.m. on a Friday night. The jury continued deliberating for an additional two hours and fifteen minutes, until 9:48 p.m., without ever receiving a response from the trial court. The duration and time of day of the jury's deliberations, combined with the trial court's conspicuous failure to answer the jury's question regarding the option of hanging to the exclusion of all other questions, left the jury with the impermissible impression that it must continue its deliberations indefinitely until the minority juror or jurors "abandon[ed] their convictions to arrive at a verdict with the majority." *Laney*, 2003-NMCA-144, ¶ 52. We therefore conclude that the trial court's failure to issue a supplementary instruction coerced the jury into reaching a verdict. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

**{20}** Our conclusion on this point disposes of the present appeal. However, to provide guidance to the trial court, we reach the merits of Defendant's remaining three claims, which may arise on remand. *See State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 37, 136 N.M. 309, 98 P.3d 699.

**B.      Whether the Trial Court Erred in Denying Defendant's Request for a Lesser Included Offense Instruction**

**{21}** Defendant requested a lesser included offense jury instruction on child abuse not resulting in death. Defendant based her request for the instruction on an incident that she admitted to in the course of the investigation, in which she pulled off Baby Colby's pants "a little too hard, and he kind of fell back on his head." The proposed instruction stated:

> For you to find [Defendant] guilty of child abuse which did not result in death or great bodily harm, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

7

> 1. [Defendant] caused [Baby Colby] to be placed in a situation which endangered the life or health of [Baby Colby];
> 2. [Defendant] acted intentionally;
> 3. [Baby Colby] was under the age of 18;
> 4. This happened in New Mexico on or about the 14th day of March, [2006].

The State objected to the instruction, arguing that the charged conduct was an "act that actually resulted in . . . serious head trauma that resulted in [Baby Colby's] death" and was not the same conduct that Defendant alleged in support of her instruction on simple child abuse. Defendant countered that a lesser included offense instruction is appropriate when, as occurred in this case, the lesser included offense has all the elements of the greater offense except one. The trial court denied Defendant's request for a lesser included offense instruction.

**{22}** On appeal, Defendant argues that the trial court erred when it denied her request for a lesser included offense instruction, because (1) "the statutory elements of simple child abuse were a subset of the elements of child abuse resulting in death," and (2) "the element that distinguishes simple child abuse from child abuse resulting in death was sufficiently in dispute at trial such that the jury could have rationally acquitted [Defendant] of child abuse resulting in death and convicted her of simple child abuse." In response, the State argues that this claim lacks merit, because (1) "the evidence, even viewed in a light most favorable to the giving of the instruction, does not support [a charge for] intentional child abuse not resulting in death," and (2) the conduct, on which Defendant bases her lesser included offense jury instruction, was "separate and distinct from the charged conduct and thus not within the scope of a lesser included offense."

**{23}** Defendant relies on the lesser included offense test established in *State v. Meadors*, 121 N.M. 38, 908 P.2d 731 (1995). In *Meadors*, we established a test that examines "not only the offense alleged in the charging instrument but also the evidence adduced at trial." *Id.* at 44, 908 P.2d at 737. Accordingly, *Meadors* recognized an entitlement to an instruction on a lesser included offense when the following tests were met:

> First, the trial court should, when faced with a request from the State for a lesser-included offense instruction, grant the request when the statutory elements of the lesser crime are a subset of the statutory elements of the charged crime. In addition, the trial court should grant such an instruction if (1) the defendant could not have committed the greater offense in the manner described in the charging document without also committing the lesser offense, and therefore notice of the greater offense necessarily incorporates notice of the lesser offense; (2) the evidence adduced at trial is sufficient to sustain a conviction on the lesser offense; and (3) the elements that distinguish the lesser and greater offenses are sufficiently in dispute such

8

that a jury rationally could acquit on the greater offense and convict on the lesser.

*Id.* The first part of the *Meadors* test expressly applies in the context of a "request from the State for a lesser-included offense instruction." *Id.* However, examining the strict statutory elements of the greater and lesser offenses is "unnecessary in the context of a defendant's request for a lesser-included instruction," because the purpose of such an examination is to determine whether a defendant had adequate notice of the lesser included offense. *State v. Darkis*, 2000-NMCA-085, ¶¶ 14-17, 129 N.M. 547, 10 P.3d 871. Thus, we turn directly to the three factors established in *Meadors* to determine if the trial court should have granted Defendant's request for a lesser included offense instruction.

**{24}** In the present case, we find the second factor to be dispositive. Under this factor, we must determine whether there was sufficient evidence adduced at trial to support Defendant's claim for a lesser included offense on simple child abuse. In addressing whether there was substantial evidence to support a conviction of child abuse, we have stated that "not every risk of injury rises to the level of felony child endangerment." *State v. Chavez*, 2009-NMSC-035, ¶ 35, 146 N.M. 434, 211 P.3d 891. Instead, courts look at "[w]hether a defendant's conduct creates a substantial and foreseeable risk of harm" to the child. *Id.* ¶ 2. To determine whether the harm to the child was foreseeable, we look at the magnitude of risk created by a defendant's conduct. *Id.* ¶ 23. Notably, we have "declined to uphold endangerment convictions where the risk of harm is too remote, which may indicate that the harm was not foreseeable." *Id.* ¶ 26.

**{25}** We generally have considered whether a defendant's conduct warrants civil remedies or criminal punishment. *See id.* ¶¶ 12-14; *State v. Massengill*, 2003-NMCA-024, ¶¶ 45-46, 133 N.M. 263, 62 P.3d 354. In *Chavez*, this Court noted that

> our Legislature has empowered the State with a broad array of civil remedies, ranging from the benign, like ensuring that children receive nutritious meals, to the intrusive, such as placement of children in foster care or termination of parental rights altogether. On the far end of this spectrum lies the sanction for criminal child abuse, which classifies abuse as, at a minimum, a third-degree felony punishable by up to three years imprisonment.

2009-NMSC-035, ¶ 12 (citation omitted). The ultimate goal of this scheme is "to preserve and reunify the family" and to give parents a "reasonable opportunity to improve their parenting skills." *Id.* ¶ 14. Thus, resort to criminal punishment that results in imprisonment is reserved for the most extreme cases, since it removes the opportunity for parents to improve their parenting skills and be reunited with their children for the duration of their imprisonment, which can be up to three years. The Legislature did not intend for courts to expose care givers to criminal punishment for their "imprudent and possibly negligent conduct." *Massengill*, 2003-NMCA-024, ¶ 46 (internal quotation marks and citation omitted) (noting that if "imprudent and possibly negligent conduct were sufficient to expose

9

a care giver to criminal liability for child endangerment, undoubtedly the majority of parents in this county would be guilty of child endangering" (internal quotation marks and citation omitted)).

**{26}** In *Massengill*, the Court of Appeals reversed the defendant's conviction of child abuse that was based on an incident in which the defendant pushed the child's stroller out in front of him beyond his reach and it fell over, causing the child to get a bruise on the forehead. *Id.* ¶¶ 43-47. The Court of Appeals held that there was insufficient evidence to support the conviction because the harm created by the defendant's conduct was too remote. *Id.* ¶¶ 45, 47. The Court reasoned that in making the offense a third-degree felony, the Legislature only intended to punish "conduct with potentially serious consequences to the life or health of a child." *Id.* ¶ 46 (internal quotation marks and citation omitted).

**{27}** In the present case, Defendant admitted to yanking Baby Colby's pants off in a rough manner, causing him to fall backward and hit his head against a carpeted floor. This was the only evidence presented at trial about this incident, which Defendant claims as the basis for her right to an instruction on a lesser included offense. We conclude that the "pants yanking" incident does not rise to the level of criminally punishable conduct, because the conduct amounts to ordinary imprudent conduct, which under our statute is not criminally punishable. Conduct is only subject to criminal punishment if it presents a risk of harm that is "substantial and foreseeable," *Chavez*, 2009-NMSC-035, ¶ 2, and could have "potentially serious consequences to the life or health of a child," *Massengill*, 2003-NMCA-024, ¶ 46 (internal quotations marks and citation omitted). The risk of harm associated with the incident was minimal and remote at best. The experts agreed that Baby Colby's death was the result of significant trauma to his head, likely resulting from forceful shaking. Accordingly, there was insufficient evidence to support a conviction for simple child abuse not resulting in death.

**{28}** Since the conduct that Defendant alleges in support of her lesser included offense instruction is not criminal, we need go no further in our *Meadors* analysis. Therefore, we conclude that the trial court properly denied Defendant's request for a lesser included offense instruction.

**C.     Whether the Trial Court Erred in Failing to Disqualify the District Attorney and His Office After Discovering That He Had a Familial Relationship with Defendant**

**{29}** Defendant filed a motion for a new trial seeking to set aside the verdict on the ground that Defendant's due process right to be prosecuted by a disinterested prosecutor were violated because the Eleventh Judicial District Attorney Karl Gillson (District Attorney) was Defendant's second cousin. At the hearing on the issue, Defendant called five witnesses. Woody Spencer, Defendant's uncle by marriage, testified that Lloyd Baldwin, Defendant's grandfather, and the District Attorney visited often. He further testified that, during one of these visits, Lloyd Baldwin introduced the District Attorney to Defendant as her grandfather

10

on her father's side, in the Navajo sense of the word. Defendant's brothers, Cornelius Smith, David Smith, and Lloyd Spencer, testified that the District Attorney was like a cousin. They further testified that when the District Attorney was a judge he acknowledged their familial relationship and gave them favorable treatment in proceedings before him. Cornelius Smith's wife, Lisa Juan, also testified and corroborated her husband's testimony. The State admitted the affidavit of the District Attorney into evidence, in which he swore that he had very little contact with Lloyd Baldwin, that Defendant was at best his third cousin, that although he is one-half Navajo he was unaware of any clan relationship between them, and that he had never had personal or direct contact with Defendant until after the prosecution of her case had begun. The District Attorney also swore that he had only recently found out that his grandmother was the sister of Defendant's great-grandfather. The trial court determined that the distant relationship had no bearing on the case and denied Defendant's motion for a new trial. During the sentencing phase of her trial, Defendant renewed her objection to the continued involvement of the Eleventh Judicial District Attorney's Office.

**{30}** Defendant argues on appeal that the trial court violated her right to due process of law when it failed to disqualify the District Attorney and his office during the sentencing phase of her trial. Defendant claims that, because she and the District Attorney are cousins and culturally like grandfather and granddaughter, the District Attorney's involvement in the case "created an opportunity for conflict or other improper influence on his professional judgment." The State responds that Defendant has failed to carry her burden of establishing a claim of bias.

**{31}** The standard of review for a trial court's decision regarding the disqualification of a prosecutor or a prosecution office "is not easily defined." *State v. Robinson*, 2008-NMCA-036, ¶ 10, 143 N.M. 646, 179 P.3d 1254. We have stated that review of disqualification orders mandates that the Court look at whether the issues involve legal or factual questions. *State v. Gonzalez,* 2005-NMSC-025, ¶¶ 24-25, 138 N.M. 271, 119 P.3d 151. When factual questions are involved, we defer to the sound judgment of the trial court. *Robinson*, 2008-NMCA-036, ¶ 10. On the other hand, "[w]here the [trial] court resolves issues involving values that animate legal principles or the consideration of abstract legal doctrines that require the balancing of underlying policies and competing legal interests, our review is de novo." *Id.* (internal quotation marks and citation omitted).

**{32}** "A prosecutor may be removed from a case for a conflict of interest where the prosecutor has a prior or current relationship with the defendant that either made the prosecutor privy to relevant, confidential information or where their relationship has created an interfering personal interest or bias." *Id.* ¶ 22 (citation omitted). "The personal bias that is disqualifying, however, is a bias that creates an opportunity for conflict or other improper influence on professional judgment. There must be a basis in fact for a determination such bias exists." *Gonzalez*, 2005-NMSC-025, ¶ 39. "[T]he defendant has the burden of going forward with evidence and the burden of persuasion." *Id.* ¶ 28. "[I]f the defendant establishes that one member of the prosecution team should be disqualified . . . [then] the burden shifts to the State to prove that the entire office should not be disqualified by

11

imputation." *Robinson*, 2008-NMCA-036, ¶ 13. It should be noted, however, that considering prosecutors' distinct role as disinterested and impartial public advocates, the "[d]isqualification of a prosecutor should remain a rare event; disqualification of an entire office even more so." *Gonzalez*, 2005-NMSC-025, ¶ 51.

**{33}** The question of whether the relationship between Defendant and the District Attorney created personal bias or prejudice is a question of fact. Therefore, we review the trial court's failure to disqualify for abuse of discretion. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (filed 1998) (internal quotation marks and citation omitted). With respect to the factual review, "we do not sit as a trier of fact," recognizing that the trial court has the best vantage from which to resolve questions of fact and to evaluate witness credibility. *State v. Vandenberg*, 2003-NMSC-030, ¶ 18, 134 N.M. 566, 81 P.3d 19. Accordingly, "we will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 28, 146 N.M. 473, 212 P.3d 361 (internal quotation marks and citation omitted).

**{34}** In resolving this question, the trial court acted as the trier of fact and had the role of judging the credibility of witnesses and determining the weight of evidence. At the disqualification hearing, there was a credibility contest between Defendant's brothers, who alleged that the District Attorney had a history of giving their family favorable treatment due to their familial relationship, and the District Attorney, who swore that he had not known that Defendant was related to him and was disinterested in Defendant's prosecution. The trial court could have reasonably believed the District Attorney's statements in his affidavit that, prior to Defendant's motion for disqualification, he was unaware of any familial or clan relationship between them and that he "never had personal or direct contact with [Defendant]." Thus, the trial court reasonably concluded that Defendant had not met her burden of proving personal bias and properly dismissed Defendant's motion for disqualification of the District Attorney and his office from the sentencing phase of Defendant's trial. Accordingly, the trial court did not abuse its discretion in determining that the familial relationship between the District Attorney and Defendant was insufficient to create a personal bias that warranted disqualification.

**D.    Whether the Trial Court Erred in Ruling That It Lacked Discretion to Alter Defendant's Sentence**

**{35}** During the sentencing phase of her trial, Defendant argued that, because child abuse resulting in the death of a child was a noncapital felony, the trial court had the discretion to alter her life sentence pursuant to Section 31-18-15.1, if it were to find any mitigating circumstances. However, the trial court concluded that the Legislature intended that a life sentence be mandatory for child abuse resulting in death, reasoning that the statute provided

12

that the alteration of a sentence could not exceed one-third of the basic sentence and one-third of a life sentence could not be calculated.  Thus, the trial court did not consider any mitigating evidence and imposed a life sentence, stating that its "hands [were] tied . . . . And [it] would really like to do some [*sic*] different so that [it] could get a ruling out of the Supreme Court, saying this isn't what we really mean . . . ."

**{36}**    On appeal, Defendant argues that Sections 31-18-15(A)(1) and 31-18-15.1 plainly grant the trial court the authority to alter the basic sentence of life imprisonment "for a [noncapital] first degree felony resulting in the death of a child."  Section 31-18-15(A)(1).  The State responds that "[t]hrough its [one-third] limitation on the alteration of a basic sentence, the Legislature communicated its intent to disallow the alteration of a life sentence."

**{37}**    Defendant's claim presents this Court with an issue of statutory construction, which we review de novo.  *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022.  "The principal command of statutory construction is that the court should determine and effectuate the intent of the legislature using the plain language of the statute as the primary indicator of legislative intent."  *State v. Ogden*, 118 N.M. 234, 242, 880 P.2d 845, 853 (1994) (internal citation omitted).  "The words of a statute . . . should be given their ordinary meaning, absent clear and express legislative intention to the contrary," as long as the ordinary meaning does "not render the statute's application absurd, unreasonable, or unjust."  *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995) (alteration in original) (internal quotation marks and citations omitted).  When the meaning of a statute is unclear or ambiguous, we have recognized that it is "the high duty and responsibility of the judicial branch of government to facilitate and promote the legislature's accomplishment of its purpose."  *State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994).

**{38}**    Section 30-6-1(H) provides, "A person who commits intentional abuse of a child less than twelve years of age that results in the death of the child is guilty of a first degree felony resulting in the death of a child."  Pursuant to Section 31-18-15(A)(1) of the Criminal Sentencing Act (CSA), "a first degree felony resulting in the death of a child" is a noncapital felony that carries a basic sentence of life imprisonment.  The trial court is required to impose "[t]he appropriate basic sentence of imprisonment . . . unless the court alters the sentence pursuant to the provisions of the Criminal Sentencing Act."  Section 31-18-15(B).  NMSA 1978, Section 31-18-15.1(A)(1) (2009)[1] of the CSA provides that "[t]he judge may

---

[1] We recognize that, in *State v. Frawley*, 2007-NMSC-057, ¶ 1, 143 N.M. 7, 172 P.3d 144, we declared Section 31-18-15.1 to be facially unconstitutional because it permits the trial court, rather than the jury, to aggravate a defendant's sentence in violation of a defendant's "right to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution."  However, in 2009, the Legislature amended Section 31-18-15.1 to rectify this constitutional infirmity.  *See* 2009 N.M. Laws, ch. 163, § 1.  Because Defendant will be

alter the basic sentence as prescribed in Section 31-18-15 NMSA 1978 upon . . . a finding by the judge of any mitigating circumstances surrounding the offense or concerning the offender." Although "[t]he amount of the alteration of the basic sentence for noncapital felonies shall be determined by the judge," Subsection (G) prohibits the judge from imposing an "alteration [that] exceed[s] one-third of the basic sentence." Section 31-18-15.1(G).

**{39}**  "[A] statute must be construed so that no part of the statute is rendered surplusage or superfluous." *State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1 (internal quotation marks and citation omitted). Sections 31-18-15 and 31-18-15.1 explicitly grant the trial court the authority to alter the basic sentence for all noncapital felonies, including those that carry a basic sentence of life imprisonment. *See* § 31-18-15(A)(1) (first degree felony resulting in the death of a child); § 31-18-15(A)(2) (first degree felony for aggravated criminal sexual penetration). To conclude that the trial court lacks this authority would require us to read Subsections (A)(1) and (A)(2) out of Section 31-18-15, which we cannot and will not do. Accordingly, we conclude that Sections 31-18-15 and 31-18-15.1 grant the trial court the authority to alter the basic sentence of life imprisonment for noncapital felonies.

**{40}**  We next address how to calculate one-third of a basic sentence of life imprisonment. "[L]ife sentences have always been understood to be different from a sentence for a term of years." *Compton v. Lytle*, 2003-NMSC-031, ¶ 11, 134 N.M. 586, 81 P.3d 39, *as modified by State v. Tafoya*, 2010-NMSC-019, ¶ 16, __ N.M. __, __ P.3d __. A life sentence lacks a maximum determinate term of imprisonment, because "'the length of the sentence cannot be determined until the death of the prisoner.'" *Id.* (quoting *Welch v. McDonald*, 36 N.M. 23, 26, 7 P.2d 292, 294 (1931)). Likewise, a life sentence lacks a minimum determinate term of imprisonment, because an inmate must serve at least "thirty years imprisonment before the possibility of parole and without good time credit eligibility." *Tafoya*, 2010-NMSC-019, ¶ 14; *see Compton*, 2003-NMSC-031, ¶ 13 (holding that the "thirty-year period [of imprisonment] . . . should not be considered a minimum sentence"). Although a life sentence lacks a definite term of years, there is "a specific point in time when inmates serving a life term . . . become eligible for parole." *Compton*, 2003-NMSC-031, ¶ 12. Specifically, "[a]n inmate of an institution who was sentenced to life imprisonment becomes eligible for a parole hearing after the inmate has served thirty years of the sentence." NMSA 1978, § 31-21-10(A) (2009).

**{41}**  We conclude that the thirty-year term for parole eligibility is the proper numerical standard by which to measure the trial court's authority to alter a basic sentence of life imprisonment under Sections 31-18-15 and 31-18-15.1. Because the trial court's "alteration

_____

sentenced under the amended version of the statute if she is convicted on remand, we need not address the State's claim that the trial court lacked the discretion to alter Defendant's sentence because Section 31-18-15.1 was facially unconstitutional at the time of Defendant's sentencing.

[cannot] exceed one-third of the basic sentence," Section 31-18-15.1(G), the trial court lacks the authority to reduce a defendant's parole eligibility by more than ten years. Accordingly, in this case, the trial court had the authority to reduce Defendant's parole eligibility by up to ten years, resulting in a sentence of twenty years of imprisonment, before the possibility of parole.[2]

**{42}** We recognize that, after mitigation, a defendant convicted of a first degree noncapital felony enumerated in Sections 31-18-15(A)(1)-(2) is no longer serving a "life sentence" as defined by New Mexico law. *See Tafoya*, 2010-NMSC-019, ¶ 14 (holding that a "life sentence" means "thirty years imprisonment before the possibility of parole and without good time credit eligibility"); *Compton*, 2003-NMSC-031, ¶ 4 (same). This reflects the Legislature's manifest intent to treat noncapital felonies that carry a *basic sentence* of life imprisonment differently from capital felonies, which carry a *mandatory sentence* of life imprisonment. *Compare* Section 31-18-15(A)(1),(2) (imposing a *basic sentence* of life imprisonment for certain noncapital felonies), *with* NMSA 1978, Section 31-18-14 (2009) (imposing a *mandatory sentence* of life imprisonment for capital felonies). Unlike a mandatory sentence of life imprisonment, a basic sentence of life imprisonment is subject to alteration, in accordance with the principles set forth in this opinion, if the trial court finds "any mitigating circumstances surrounding the offense or concerning the offender." Section 31-18-15.1(A)(1).

## III.   CONCLUSION

**{43}** We conclude that the trial court (1) improperly failed to answer the jury's question regarding the option of hanging, (2) properly denied Defendant's request for a lesser included offense instruction on child abuse not resulting in death, (3) did not abuse its discretion by denying Defendant's motion to disqualify the District Attorney's Office, and (4) improperly failed to consider mitigating evidence at Defendant's sentencing hearing pursuant to Sections 31-18-15 and 31-18-15.1. Accordingly, we reverse Defendant's conviction and remand for a new trial.

**{44}   IT IS SO ORDERED.**

_____

**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____

[2] We leave open the question of whether a defendant convicted of a first degree felony that carries a basic sentence of life imprisonment, but whose sentence is altered pursuant to Section 31-18-15.1(A)(1), is eligible to earn good time credits under the Earned Meritorious Deductions Act, NMSA 1978, Section 33-2-34 (2006).

15

**CHARLES W. DANIELS, Chief Justice**


**PATRICIO M. SERNA, Justice**


**RICHARD C. BOSSON, Justice**


**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Juan*, Docket No. 31,319**

| | |
|---|---|
| **AT** | **ATTORNEYS** |
| AT-CI | Conflict of Interest |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-AG | Aggravating or Mitigating Circumstances |
| CL-CN | Child Abuse and Neglect |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-AS | Alteration of Sentence |
| CA-JI | Jury Instructions |
| CA-LO | Lesser Included Offense |
| | |
| **EV** | **EVIDENCE** |
| EV-CR | Credibility of Witnesses |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-FG | Failure to Give or Request |