# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  May 7, 2015**

**NO. 33,781**

**STATE OF NEW MEXICO**,

　　　　Plaintiff-Appellee,

**v.**

**ADRIANA CABEZUELA,**

　　　　Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Jorge A. Alvarado, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**BOSSON, Justice.**

{1}   This Court previously issued an opinion following Defendant Adriana Cabezuela's first trial in which a jury convicted her of intentional child abuse resulting in the death of her eight-month-old daughter Mariana Barraza (Baby Mariana). *See State v. Cabezuela* (*Cabezuela I*), 2011-NMSC-041, ¶ 1, 150 N.M. 654, 265 P.3d 705 (reversing the conviction, holding that the jury was improperly instructed, and remanding for retrial) . After we reversed and remanded for a new trial, Defendant was again tried and convicted of the same offense and sentenced to life imprisonment.

{2}   On direct appeal, Defendant argues that (1) the district court erred by not holding a presentencing hearing to consider mitigation evidence before imposing a life sentence, (2) the evidence was not sufficient to support her conviction, (3) a forensic pathologist's trial testimony violated Defendant's constitutional right to confrontation, (4) the district court improperly instructed the jury by giving UJI 14-610 NMRA (1993, withdrawn 2015), a definition instruction on intent, and (5) Defendant's trial counsel provided ineffective assistance. We decide in the State's favor with respect to issues (2) through (4). With respect to issue (1), however, we conclude that the district court should have heard evidence in mitigation before

imposing sentence, and we remand to the district court for a new sentencing hearing. With respect to issue (5), we conclude that Defendant's ineffective assistance of counsel argument is more appropriately considered in a habeas corpus proceeding.

**BACKGROUND**

{3}     Defendant was the mother of six children. The three youngest, including Baby Mariana, resided in the house Defendant shared with her boyfriend, Leonardo Samaniego, Jr. The other three children lived with either their father or grandmother. Samaniego was not the father of any of Defendant's six children.

{4}     At approximately 1:45 a.m. on June 14, 2007, Officer Shawn Hardison responded to a 911 call regarding an unresponsive child in Hobbs, New Mexico. Officer Hardison testified that when he arrived, he saw Defendant outside on a cell phone crying and that she asked him to "help her baby." Inside the house, Officer Hardison found Baby Mariana on the floor, wearing a diaper, and not moving. There were other people inside the house, but no one was attending to Baby Mariana. Baby Mariana was pale or blueish and did not appear to be breathing. When Officer Hardison placed his cold hand on Baby Mariana's chest, she "took a ragged breath" as the ambulance arrived. Emergency medical technicians then took over and transported Baby Mariana to Lea Regional Medical Center (LRMC) where she later

died.

{5}     While Officer Kathleen Rix was at LRMC for an unrelated matter, a nurse approached her and asked her to look at Baby Mariana. Officer Rix first noticed bruising all along Baby Mariana's right side, because that was the side facing her. Officer Rix testified that when she got a better look at Baby Mariana's entire body, she saw "just bruises pretty much everywhere." Defendant and Samaniego arrived at LRMC and spoke with one of the emergency room doctors while other medical staff treated Baby Mariana. They left with police officers before medical personnel pronounced Baby Mariana dead.

{6}     Defendant spoke with officers at the police station. Initially, she professed not to have any idea how Baby Mariana stopped breathing or how she sustained any of the visible injuries on her body. As the interview evolved, however, Defendant made a number of highly incriminating statements which we discuss in more detail later in this opinion.

{7}     A jury found Defendant guilty of intentional child abuse resulting in Baby Mariana's death, and the district court sentenced Defendant to life imprisonment. Defendant appeals her conviction directly to this Court. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life

imprisonment shall be taken directly to the supreme court."); *see also* Rule 12-102(A)(1) NMRA (providing for direct appeals to the Supreme Court from a life sentence).

**DISCUSSION**

**The District Court Should Have Heard Mitigation Evidence Before Sentencing Defendant to Life Imprisonment**

{8}     We take the unorthodox step of proceeding directly to sentencing before discussing the issues relevant to Defendant's conviction. We do so because our legal precedent dictates clearly that Defendant was entitled to present mitigation evidence and have the district court consider reducing her life sentence by up to ten years (one-third of thirty years, the minimum before one becomes eligible for parole). *See* NMSA 1978, § 31-18-15(A)(1) (2007); NMSA 1978, § 31-18-15.1(A)(1) (2009); NMSA 1978, § 31-21-10(A) (2009).

{9}     Section 31-18-15.1(A)(1) provides:

> The court shall hold a sentencing hearing to determine if mitigating or aggravating circumstances exist and take whatever evidence or statements it deems will aid it in reaching a decision to alter a basic sentence[ and] may alter the basic sentence . . . upon . . . a finding by the judge of any mitigating circumstances surrounding the offense or concerning the offender . . . .

At the sentencing hearing in this case, which appears to have taken no more than two

4

minutes, the State informed the district court that Defendant was "subject to a sentence of life in prison followed by a period of five years parole, which is a minimum mandatory sentence of thirty years" without any provision for mitigation. Defense counsel agreed that "this is a situation where there is a minimum mandatory sentence, thus anything that we discuss here today does not affect that." Apparently then, both attorneys were operating under a legal misapprehension that a conviction of intentional child abuse resulting in the death of a child under twelve requires a minimum mandatory sentence of thirty years. Both were wrong, and as a result misled the sentencing court.

{10} Nearly five years ago, we addressed this same issue in *State v. Juan*, 2010-NMSC-041, ¶¶ 35-42, 148 N.M. 747, 242 P.3d 314. In *Juan*, we concluded that the Legislature gave district courts "authority to alter the basic sentence of life imprisonment for noncapital felonies," including intentional child abuse resulting in the death of a child. *Id.* ¶ 39. *See* § 31-18-15(A)(1) (describing a first degree felony resulting in the death of a child as a noncapital felony subject to a basic sentence of life imprisonment).

{11} Mandatory life sentences, with or without the possibility of parole after thirty years, are for capital felonies and are not subject to mitigation. *See Juan*, 2010-

NMSC-041, ¶ 42 ("[C]apital felonies . . . carry a *mandatory sentence* of life imprisonment."). Unlike a capital felony, a *basic sentence* of life imprisonment for a noncapital felony is not a mandatory life sentence and is subject to mitigation. *See id.* ("Unlike a mandatory sentence of life imprisonment, a basic sentence of life imprisonment is subject to alteration . . . if the trial court finds any mitigating circumstances surrounding the offense or concerning the offender." (internal quotation marks and citation omitted)).

{12}     It follows that this Defendant was found guilty of a noncapital felony and, as a result, her life sentence was basic, not mandatory. Accordingly, the district court was required to consider mitigation evidence before issuing a final sentence.

{13}     In *Juan*, we discussed the "proper numerical standard by which to measure the [district] court's authority to alter a basic sentence of life imprisonment," and concluded that it was at the point in time when an inmate becomes eligible for parole. *Id.* ¶ 41. In this case, that period is thirty years. *Id.* Section 31-18-15.1(G) provides that "in no case shall the alteration [of a defendant's sentence] exceed one-third of the basic sentence." Since our opinion in *Juan*, the district court has had the authority to alter Defendant's basic sentence of life imprisonment by reducing the number of years she has to serve before becoming eligible for parole by up to one-third of the

6

minimum possible sentence, or ten years. As a result, the basic sentence of thirty years before parole eligibility could become as little as twenty years. But that decision can only be made after considering evidence in mitigation, and we remand for that purpose.

**The State Presented Substantial Evidence to Support Defendant's Conviction for Intentional Child Abuse Resulting in the Death of Her Daughter**

{14}     Defendant challenges the sufficiency of the evidence to support her verdict, yet, ironically, much of the State's evidence came directly from her own statements to officers presented by the State at trial. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). In her initial interview with police officers, Defendant changed her story more than once. She first offered that Baby Mariana fell off the bed the previous afternoon. When prodded about what appeared to be bite marks on Baby Mariana's body, Defendant told the officer that her eighteen-month-old child caused them. Defendant later admitted, however, that she had lost control a few times when Baby Mariana was crying and had bitten Baby Mariana on her legs and cheek.

{15} When asked if Baby Mariana's "head could have popped back" at some point, Defendant responded, "I don't recall shaking her." She insisted that she had never hit or thrown Baby Mariana. Also in the interview, Defendant stated, "I don't want to go to jail . . . . I'm giving my rights up to my kids." After the officer again asked her for an explanation for the visible bruising on Baby Mariana, Defendant admitted that she had sometimes lost her temper and had shaken her child, saying, "I can't be patient . . . . I just want them to go live with their dad 'cause I don't want to hurt them no more."

{16} When asked about a big bruise on Baby Mariana's forehead, Defendant initially said she could not remember what caused the bruise, but then stated that it happened the previous day at a storage facility. Defendant said that she shook the baby carrier with Baby Mariana in it because the baby was crying and she "lost [her] temper." Defendant then admitted "I probably hit her head; I didn't mean to hit her hard."

{17} Defendant discussed another instance when she lost her temper and threw Baby Mariana on the bed. "She could have . . . [hit her head], probably against the wall . . . . I didn't see her [hit the wall]." Defendant insisted that before the 911 call on June 14, 2007, nothing happened to Baby Mariana and that she did not remember anything

happening. However, when the officer continued to question her, Defendant stated that she may have put Baby Mariana down too hard and later admitted that she had tossed Baby Mariana to the floor. Further in the interview, Defendant admitted that she jerked Baby Mariana off the floor, and at that point Baby Mariana stopped crying. After Defendant carried Baby Mariana to her bed, Samaniego noticed that something was wrong and Defendant saw that Baby Mariana did not appear to be breathing. Samaniego and Defendant drove Baby Mariana to Samaniego's father's house to call 911.

{18}    In addition to these admissions, the State offered trial testimony from Dr. Michelle Barry Aurelius, the attending physician at the Office of the Medical Investigator and the supervising forensic pathologist at Baby Mariana's autopsy.[1] Dr. Aurelius worked with Dr. Ann Bracey, a pathology fellow assigned to the autopsy. Acting in coordination, Dr. Aurelius and Dr. Bracey made various decisions regarding what tests to perform, and observed and recorded the injuries (including the head and brain injuries). Dr. Aurelius worked with Dr. Bracey to compile the autopsy report, and Dr. Aurelius signed the death certificate.

---

[1]Dr. Aurelius is the same person as "Dr. Michelle Barry" referred to in *Cabezuela I. See* 2011-NMSC-041, ¶ 48. At this trial, she identified herself as "Dr. Michelle Barry Aurelius."

9

{19}    Dr. Aurelius' testimony revealed numerous injuries that she had observed on Baby Mariana's face, including bruises over her forehead, a skin tear on the outside of her left eye, multiple green to black bruises on the left side of her face, skin abrasions, and bruises on her ear, nose, right eye, right cheek, and jaw line. Baby Mariana had bruising deep in the skin of her head and along the skull. There was also evidence of bleeding around her brain and inside her eyes.

{20}    Testimony further revealed that Baby Mariana's torso and extremities carried a number of contusions (bruises) and abrasions. The number and age of the bruises could not be quantified because of variation in the coloration of bruises on different parts of the body. According to Dr. Aurelius, Baby Mariana died from a fatal, traumatic brain injury that could have killed her instantly or left her in a comatose state from the moment the injury occurred until she was pronounced dead.

{21}    Dr. Aurelius also testified about the scope of Baby Mariana's injuries and the cause and manner of death. When asked if the external bruising could have been consistent with a "pattern of abuse," or "more than one hit, more than one strike," Dr. Aurelius replied, "it could have been." Dr. Aurelius further testified that the brain injury could be consistent with Baby Mariana being thrown to a carpeted floor.

{22}    Despite the evidence against her, Defendant now argues that the State

10

presented insufficient evidence at trial to prove that she had *intentionally* abused Baby Mariana. At trial, Defendant offered an alternative theory to explain the brain injury, that Baby Mariana fell off a van at a storage facility the afternoon before Defendant took her to the hospital. Relying on this theory, Defendant argued below and to this Court that she may have been negligent in not taking her daughter to the hospital sooner, but nothing more.

{23}    Essentially, Defendant asks this Court to weigh her credibility and substitute our judgment for that of the jury. Defendant's argument is that her "account provided a plausible explanation of what had actually happened. Although the jury was not required to accept [Defendant's] version of events, her explanation should not simply be disregarded by this Court." We have previously observed in this very case that "the jury is free to reject Defendant's version of the facts." *Cabezuela I*, 2011-NMSC-041, ¶ 45 (internal quotation marks and citation omitted). We "will not invade the jury's province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] [our] judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (first three alterations in original) (internal quotation marks and citation omitted).

11

{24} The jury had ample evidence before it to convict Defendant of intentional child abuse. There were Defendant's own admissions that she bit, threw, jerked, and slapped Baby Mariana. Defendant's police interview could appear to a reasonable jury as a classic change-of-story scenario. Initially, Defendant did not "remember" or did not "know" how the injuries occurred, but over the course of time gave explanations for the injuries alongside her statement that she "d[id]n't want to go to jail." And then there was Dr. Aurelius' expert testimony describing the extensive bruising as consistent with a pattern of abuse. Substantial evidence supports the verdict in this case.

**Trial Testimony from the Supervising Forensic Pathologist Dr. Aurelius Did Not Violate Defendant's Constitutional Right to Confrontation**

{25} We have previously summarized Dr. Aurelius' testimony at trial and how it contributed materially to the substantial evidence in support of Defendant's conviction. Importantly, Dr. Aurelius testified without objection, and therefore our review on appeal is limited to fundamental error. *See Cabezuela I*, 2011-NMSC-041, ¶ 49. ("[B]ecause [the Confrontation Clause] claim was not preserved, we review only for fundamental error."). "Fundamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience

12

to allow the conviction to stand." *State v. Cunningham*, 2000-NMSC-009, ¶ 13, 128 N.M. 711, 998 P.2d 176 (internal quotation marks and citation omitted).

{26}   Despite the lack of objection, Defendant argues on appeal that this testimony violated her constitutional right to confront the witnesses against her because Dr. Aurelius testified in part about work done by Dr. Bracey, a pathology fellow working under Dr. Aurelius' supervision. U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .").

{27}   We rejected this same argument in *Cabezuela I*, where Dr. Aurelius also testified about Baby Mariana's injuries and offered her opinion as to the cause and manner of death, much as in the present trial. *See* 2011-NMSC-041, ¶¶ 52, 54. Dr. Aurelius gave her expert opinion in the present trial that Baby Mariana suffered a traumatic brain injury which could have killed her instantly or induced a coma, "so that devastating injury would have occurred between the last time that she was seen acting normally and when she was declared dead." Dr. Aurelius also testified that some of Baby Mariana's injuries could have been over eighteen hours old due to the yellow color of some of the bruises but that it was difficult to estimate when all the injuries occurred because "we can bruise different ways in different colors in different

13

parts of the body even though injuries may have all occurred at the same time, except for the yellow." She further testified that the injuries to the brain did not show any signs of healing.

{28} Dr. Aurelius supervised and worked alongside Dr. Bracey during the autopsy. While Dr. Bracey dissected the body and photographed the injuries, both pathologists examined the injuries and the organs together, both decided what tests to perform, they observed the injuries in the head and brain together, and together they compiled their opinion in the autopsy report. Dr. Aurelius signed the death certificate. Based on the foregoing, we conclude that Dr. Aurelius made independent, personal observations and had personal knowledge regarding Baby Mariana's extensive injuries, their likely cause, and the manner of Baby Mariana's death sufficient to support her testimony and opinions. We reject Defendant's suggestion that Dr. Aurelius was simply "parroting" the conclusions of Dr. Bracey who did not testify. *See State v. Navarette*, 2013-NMSC-003, ¶ 22, 294 P.3d 435.

{29} Defendant launches a second confrontation clause challenge independent of the absence of Dr. Bracey. Prior to trial, Dr. Aurelius consulted a forensic odontologist, Dr. Pete Loomis, for his expert opinion regarding the bite marks on Baby Mariana's body. Dr. Loomis did not testify. Instead, based on Dr. Loomis's opinions, Dr.

Aurelius testified that one of the injuries was "more likely than not an adult human bite mark." Another was only "slightly suggestive" of an adult human bite mark. And another was probably not a bite mark, but had a similar shape.

{30}     Insofar as Dr. Aurelius was allowed to testify about Dr. Loomis' opinions, our precedent makes clear that Defendant was deprived of her constitutional right to confront Dr. Loomis about his opinions. *See Navarette*, 2013-NMSC-003, ¶¶ 22-23, 28; *see also State v. Sisneros*, 2013-NMSC-049, ¶¶ 25, 31, 314 P.3d 665. Even if Dr. Loomis' opinions were admitted in error, however, "[i]mproperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *State v. Tollardo*, 2012-NMSC-008, ¶¶ 2, 25, 275 P.3d 110. "[H]armless error review necessarily requires a case-by-case analysis," questioning whether a guilty verdict in a particular case is attributable to a particular error. *Id.* ¶ 44.

{31}     Our review of the evidence satisfies us that the error here had no such effect. Although Dr. Aurelius' testimony about the apparent bite marks related to one or two of the injuries, it was a very minor portion of her overall testimony. Importantly, her testimony about bite marks did not relate to the cause and manner of Baby Mariana's death. Baby Mariana died from blunt force trauma and traumatic brain injury, not from injuries resulting in bite marks. Furthermore, during her police interviews

15

Defendant admitted to biting Baby Mariana, and those interviews were admitted into evidence. Accordingly, the bite mark testimony, though rising to the level of constitutional error, had little, if any, effect on the verdict. We conclude that there is no reasonable possibility that the error contributed to the verdict. *See Tollardo*, 2012-NMSC-008, ¶ 32 (holding that a constitutional error is "harmless if there is no reasonable possibility . . . that the error contributed to the defendant's conviction" (internal quotation marks omitted)).

**Giving the Jury UJI 14-610 ("Child Abuse; 'Intentional'; Defined.") Did Not Amount to Fundamental Error**

{32} After Defendant's first trial, she argued on appeal that the district court had improperly instructed the jury. "Specifically, Defendant argue[d] that the phrase 'failure to act' should have been omitted [from the *elements* instruction, tracking UJI 14-602 NMRA (2000, withdrawn 2015)] because such language aligns itself solely with a negligent child abuse theory." *Cabezuela I*, 2011-NMSC-041, ¶ 19. In *Cabezuela I*, the State argued that either an act or a failure to act could form the basis for committing the crime of intentional child abuse, and therefore the jury was not given a separate instruction on negligent child abuse. *Id.* ¶ 20. In reversing and remanding for a new trial, this Court agreed with Defendant. We based our reasoning

16

partially on the lack of a separate instruction for negligent child abuse in light of the State's theory of a failure to act. *See id.* ¶ 36.

{33} At the second trial, the State once again pursued a conviction for intentional child abuse and not negligent child abuse. This time, however, the State limited its theory to intentional child abuse based on Defendant's own actions as demonstrated by her incriminating statements of intentional abuse and did not pursue a failure-to-act theory. This time Defendant, not the State, presented an alternative theory of a negligent failure to act based on Defendant's own statements that she may have waited too long to take Baby Mariana to the hospital. Accordingly, in the second trial the jury received a separate, step-down instruction on negligent child abuse resulting in death, tracking UJI 14-603 NMRA (2000, withdrawn 2015).[2]

{34} In *Cabezuela I*, we held that it was a misstatement of the law to include the "phrase 'failure to act'" in the *elements* instruction for intentional child abuse, UJI 14-

---

[2]The district court instructed the jury in instruction no. 5 that if it had "a reasonable doubt as to whether the defendant committed the crime of Intentional [C]hild Abuse Resulting in Death [then it] must proceed to determine whether the defendant committed the included offense of Negligent Child Abuse Resulting in Death." The instruction for negligent child abuse resulting in death was given as instruction no. 6, and the instruction for intentional child abuse resulting in death was instruction no. 3. We assume that because the jury found Defendant guilty of intentional child abuse, the jurors did as they were instructed and did not go on to consider whether she was guilty of negligent child abuse.

17

602, when the State was pursuing a conviction for intentional child abuse. *Cabezuela I*, 2011-NMSC-041, ¶¶ 20, 27, 36. At the second trial, the district court appears to have followed our instruction in *Cabezuela I* and did not include the failure-to-act language when it instructed the jury on the elements of intentional child abuse. The district court correctly instructed the jury that the State had to prove that Defendant acted intentionally and that her actions endangered Baby Mariana and ultimately caused her death. Defendant did not object to the elements instruction at the second trial.

INSTRUCTION NO. 3

For you to find Adriana Cabezuela guilty of intentional child abuse resulting in death or great bodily harm, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
1. Adriana Cabezuela caused Mariana Barraza to be placed in a situation which endangered the life or health of Mariana Barraza[;]
2. The defendant acted intentionally;
3. Adriana Cabezuela's actions resulted in the death of Mariana Barraza;
4. Mariana Barraza was under the age of 12;
5. This happened in New Mexico on or about the 14th day of June, 2007.

*See* UJI-14-602 ("Child abuse; intentional act or negligently 'caused'; great bodily harm; essential elements.").

18

{35}    Correctly, Defendant does not challenge this instruction on appeal. Instead, Defendant now turns her attention to a separate instruction, not an elements instruction, that *defined* the word "intentional." That instruction reads:

INSTRUCTION NO. 4

A person acts intentionally when the person purposely does an act. Whether . . . Adriana Cabezuela acted intentionally may be inferred from all of the surrounding circumstances, such as Adriana Cabezuela's actions or *failure to act*, conduct and statements.

(Emphasis added.) *See* UJI 14-610 ("Child abuse; 'intentional'; defined.").

{36}    Instruction no. 4, the definition instruction for intent, tracks UJI 14-610 and includes the phrase "failure to act." *Cabezuela I*, 2011-NMSC-041, ¶ 18. In *Cabezuela I*, the district court gave the jury this same *definition* instruction for intentional child abuse, without objection either at trial or on appeal. *Id.* Similarly, Defendant had no objection to this same definition instruction at her second trial. In this second appeal, she now claims the definition instruction amounted to fundamental error.

{37}    We review unpreserved issues regarding jury instructions for fundamental error. *Cabezuela I*, 2011-NMSC-041, ¶ 21. "The exacting standard of review for reversal for fundamental error requires the question of guilt [be] so doubtful that it would shock the conscience [of the court] to permit the verdict to stand." *State v.*

19

*Swick*, 2012-NMSC-018, ¶ 46, 279 P.3d 747 (alterations in original) (internal quotation marks and citation omitted). "With regard to jury instructions, fundamental error occurs when, because an erroneous instruction was given, a court has no way of knowing whether the conviction was or was not based on the lack of the essential element." *Id.* Part of the fundamental-error analysis is "whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Sandoval*, 2011-NMSC-022, ¶ 13, 150 N.M. 224, 258 P.3d 1016 (internal quotation marks and citation omitted).

{38} In this appeal, Defendant focuses on paragraph 37 of *Cabezuela I*, where this Court "request[ed] that the UJI Committee for Criminal Cases . . . review UJI 14-602, along with UJI 14-603 and UJI 14-610." *Cabezuela I*, 2011-NMSC-041, ¶ 37. We observed that UJI 14-610, which defines the term "intentional," includes the phrase "failure to act." *Cabezuela I*, 2011-NMSC-041, ¶ 37. We further observed that NMSA 1978, Section 30-6-1(D) (2009) (defining the crime of abuse of a child) "does not reference a defendant's failure to act." *Cabezuela I*, 2011-NMSC-041, ¶ 37. Finally, we requested that the Committee review these jury instructions in their entirety in an effort to reduce confusion. *Id.* ¶¶ 36-37.

{39} In requesting the Committee to review UJI 14-610, we did not hold that

20

including the phrase "failure to act" in the definition of "intentional" was necessarily incorrect or legally erroneous. We simply invited the Committee to study whether there was a better, more clear way to provide jury guidance. Part of our concern was, and is, that there must be a culpable *act* that a defendant commits, not just a desire or intention that the abuse occur, in order for a defendant to be convicted of intentional child abuse. Our concern that a culpable act must be identified, however, should not preclude the jury from considering *all conduct*, including actions and failures to act, surrounding the culpable act itself, as evidence of the accused's subjective intent.

{40} In this trial, the elements instruction correctly required the jury to find that Defendant performed an intentional act to convict her of intentional child abuse, not a failure to act. Nonetheless, Defendant argues that the jury could have been misled by the definition instruction that uses the phrase "failure to act." Defendant maintains that she could have been convicted of intentional child abuse without the jury actually finding that she acted intentionally. We are not persuaded.

{41} While the definition instruction does have the words "failure to act," it does not equate acting and failing to act as Defendant suggests. In its first sentence the instruction, UJI 14-610, provides that "[a] person acts intentionally when the person purposely does an act." The second sentence qualifies what may be used as evidence

21

of a person's intention to act, by inferring a person's subjective intent from objective evidence. "Whether the [defendant] acted intentionally may be inferred from all of the surrounding circumstances, such as [the defendant's] actions or failure to act, conduct and statements." UJI 14-610. Specifically, the jury may infer that a person "purposefully [performed] an act" by looking at all the circumstances that surrounded the act performed. Thus, the *surrounding circumstances* necessarily include actions, failures to act, conduct, and statements other than the culpable act that forms the basis for intentional child abuse.

{42} Nonetheless, we acknowledge the greater clarity in removing altogether any reference to "failure to act" from the definition instructions. New uniform jury instructions, effective for all cases pending or filed on or after April 3, 2015, no longer include a definition for "intentional," which is the crux of the discussion in this section. UJI 14-623 NMRA. Instead, the new instructions provide that UJI 14-141 NMRA ("General criminal intent.") be given to juries to aid them in understanding the legal concept of intent. UJI 14-141 states in relevant part that "[w]hether the defendant acted intentionally may be inferred from all of the surrounding circumstances, such as the manner in which he acts, the means used, [and] his conduct [and any statements made by him]." (alterations in original)

22

(footnote omitted).

{43} While in *Cabezuela I* we observed that UJI 14-610 is not necessarily the model of clarity, we did not hold that the district court committed error by giving that instruction to the jury. *See* 2011-NMSC-041, ¶¶ 36, 37. In this case, where the State's theory was based entirely on evidence of what Defendant did, not on what she did not do—a theory amply supported by substantial trial evidence—we fail to find any significant risk of jury confusion, substantial injustice, or a doubtful verdict. Any concerns we may have shared in the past about how to improve UJI 14-610 do not shake our confidence in this jury verdict. We find no fundamental error in the language of jury instruction no. 4.

**Defendant's Ineffective Assistance of Counsel Claim Is More Properly Brought in a Habeas Corpus Proceeding**

{44} Defendant further argues that trial counsel provided ineffective assistance because counsel "[f]ailed [t]o [c]all [w]itnesses [a]nd [p]resent [t]he [d]efense [s]he [r]equested." "For a successful ineffective assistance of counsel claim, a defendant must first demonstrate error on the part of counsel, and then show that the error resulted in prejudice." *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289. "The record is frequently insufficient to establish whether an action taken

23

by defense counsel was reasonable or if it caused prejudice." *State v. Arrendondo*, 2012-NMSC-013, ¶ 38, 278 P.3d 517. In this case, it is more appropriate for Defendant to make this claim in a habeas corpus proceeding where she "may actually develop the record with respect to defense counsel's actions." *Id.*

**CONCLUSION**

{45}     We affirm Defendant's conviction, but remand to the district court for resentencing following an evidentiary hearing where it considers any mitigating circumstances that may be present, consistent with this opinion.

{46}     **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

24

_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**

25