This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date:  August 13, 2018**

**STATE OF NEW MEXICO,**

 Plaintiff-Appellee,

v.                                                                  **NO. S-1-SC-36061**

**CARLOS ORTIZ,**
**n/k/a Jesus Suarez,**

 Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**David N. Williams, District Judge**

Law Works LLC
John A. McCall
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**DANIELS, Justice.**

{1}  Defendant Jesus Suarez appeals his convictions for felony murder and related offenses arising from a deadly home invasion. He argues that there is insufficient evidence to support his convictions and that he received ineffective assistance of counsel because his trial counsel did not attempt to have the court join this prosecution for trial, before one jury, with a separate prosecution charging Defendant with murdering another victim in a separate home invasion on the same day, a case we have addressed on this date in a separate decision, *State v. Suarez*, S-1-SC-36080.

{2}  We conclude that substantial evidence supports Defendant's convictions and that the record before us fails to establish a prima facie case of ineffective assistance of counsel. We affirm Defendant's conviction by nonprecedential decision. *See* Rule 12-405(B) NMRA ("The appellate court may dispose of a case by non-precedential order, decision or memorandum opinion . . . [where t]he issues presented have been previously decided by the Supreme Court or Court of Appeals . . . [or t]he presence or absence of substantial evidence disposes of the issue . . . [or t]he asserted error is not prejudicial to the complaining party . . . [or t]he issues presented are manifestly

2

without merit."). But we also address an issue not raised by appellate counsel and reverse Defendant's conviction for aggravated burglary, the predicate felony for his felony murder conviction, on double jeopardy grounds.

## I.    BACKGROUND

**{3}**    The charges against Defendant arose from a homicide committed in Albuquerque, New Mexico, on February 25, 2013. Victim Robert Kinter was at home with his girlfriend Peri Schindler in their two-bedroom house where he kept a lockbox and safe in his bedroom.

**{4}**    At approximately 1:30 a.m., Schindler saw Kinter asleep in his bedroom before going to her separate bedroom to sleep. After she went to her bedroom, she saw chunks of plaster fly into the room and heard people kicking in the front door to the house and yelling, "APD. Where's the money? Where's the money?" A surveillance camera in the living room facing the front door captured footage of two men breaking the front door open and entering the house. Schindler testified that neither of them was authorized to enter the house.

**{5}**    After the two men entered the house, Schindler heard gunshots and smelled gunpowder, and then one of the men entered her bedroom and stared at her for a minute with a gun in his hand before returning to Kinter's bedroom. The same person returned to her bedroom and again stared at her with a gun in his hand. As he left her

3

bedroom the second time, he said, "You never saw me." Schindler waited in her bedroom to hear the sound of a car drive away before checking on Kinter. She yelled to him, but when he did not respond, she went to his bedroom, where he "was faced down in a pool of blood." She then contacted the police.

{6}     When police arrived, officers escorted Schindler out of the house. The front door was found to be damaged and its doorjamb was broken. A white cell phone was on the floor in Kinter's bedroom near the closet with its battery exposed. At trial, Schindler testified that the phone belonged neither to her nor to Kinter. The phone was registered to Defendant's sister, who lived in Albuquerque. After police obtained a search warrant for the phone, an agent from the Drug Enforcement Administration extracted photographs, text messages, and printouts of phone numbers from the phone. A detective testified at trial that the investigation showed that Defendant had used the phone. Several messages sent to and from the phone mentioned the name "Jesus." Listed in the phone as a contact was "Abuela," which was the name of Defendant's only emergency contact in a police database. The detective also identified Defendant in several photographs retrieved from the phone.

{7}     Police testified at trial that they found .45 caliber bullets and casings in Kinter and Schindler's house. Forensic pathologist Dr. Ross Zumwalt, who supervised Kinter's autopsy, testified that the cause of Kinter's death was gunshot wounds and

4

that the manner of death was a homicide.

{8} Several days after the shooting of Kinter, police apprehended Defendant in the front yard of the house where he lived and found a .45 caliber pistol underneath a bush next to Defendant. A forensic firearm examiner testified at trial that the bullets and casings found at the crime scene were fired from that pistol.

{9} Schindler tentatively identified Defendant as one of the two intruders from a pretrial photographic array. At trial, she explained that her initial identification had been expressed as tentative because of Defendant's warning to her at the time of the murder, but at trial she testified that she was certain Defendant was the person who entered her bedroom with the handgun. The other intruder was identified as Luis Vargas-Rivera.

{10} At trial, the jury found Defendant guilty of felony murder, conspiracy to commit felony murder, aggravated burglary by use of a deadly weapon, conspiracy to commit aggravated burglary by use of a deadly weapon, armed robbery, conspiracy to commit armed robbery, and intimidation of a witness. The jury also made special findings that Defendant used a firearm to commit aggravated burglary by use of a deadly weapon, armed robbery, and intimidating a witness.

{11} The district court sentenced Defendant to concurrent prison terms of life for felony murder, nine years for conspiracy to commit felony murder, ten years for

5

aggravated burglary, three years for conspiracy to commit aggravated burglary, three years for conspiracy to commit armed robbery, and four years for intimidation of a witness. The court also imposed a consecutive prison sentence of eleven years for armed robbery, for a total sentence of life plus eleven years in prison.

{12} Because he received a life sentence, Defendant appealed his convictions directly to this Court. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *State v. Smallwood*, 2007-NMSC-005, ¶ 6, 141 N.M. 178, 152 P.3d 821.

## II. DISCUSSION

{13} We address Defendant's appellate contentions that insufficient evidence supports his felony murder conviction and that he was denied effective assistance of counsel.

## A. Sufficient Evidence Supports Defendant's Felony Murder Conviction

{14} "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Cabezuela*, 2015-NMSC-016, ¶ 14, 350 P.3d 1145 (internal quotation marks and citation omitted). "Substantial evidence is evidence acceptable to a reasonable mind

6

as adequate to support a conclusion." *State v. Arrendondo*, 2012-NMSC-013, ¶ 10, 278 P.3d 517. We review the evidence "in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *State v. Consaul*, 2014-NMSC-030, ¶ 42, 332 P.3d 850 (internal quotation marks and citation omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

{15} In reviewing the sufficiency of the evidence, this Court "must take into account both the jury's fundamental role as factfinder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641.

{16} The only challenge Defendant makes to the sufficiency of evidence is to the proof of his identity. He points to the lack of clarity in the surveillance video footage, the uncertainties in Schindler's testimony, the ownership of the white cell phone, and the possibility of the .45 caliber murder weapon having been planted in his yard. He contends that the State offered no substantial proof that he entered Kinter and Schindler's house or that he was in possession of either the phone or the firearm. He also asserts that the photographic array shown to Schindler was impermissibly

suggestive.

{17} Defendant contends that the surveillance camera footage was sufficient to identify Vargas-Rivera but not the second person who entered the house. Accordingly, Defendant argues that there can be no reasonable inference that Defendant was the second person. He also characterizes the quality of the video as "very grainy," resulting in "forensic experts [being unable to] obtain a clear picture of the alleged shooter that killed Robert Kinter." However "grainy" the footage may be, it nonetheless reveals a second person who entered the house with Vargas-Rivera.

{18} He also argues that Schindler's testimony is conflicted because of an inconsistency in her statements. He points to a portion of her testimony where she said that she could not identify the person who entered her bedroom because she covered her eyes and that she was unclear on whether she had one or two encounters with the person. The conflict arising in her identifications and her descriptions of Defendant, and the inconclusiveness of the surveillance footage, Defendant contends, is enough to discount the evidence as insubstantial.

{19} At one point, Schindler testified that she covered her eyes at the point when the gunman entered her room because she did not want him to see her see him. And she explained that if the person wanted to kill her, she did not want to see it coming. But she did not testify that she never got a look at the intruder, whom she testified had

8

entered her bedroom two different times:

> Q. [Defense counsel] So he was probably in your room, what, ten seconds or less?
> A. [Schindler] He was in my room twice.
> Q. Okay. But you didn't tell the police that, right? You told the police that you didn't think he came back to your room a second time; do you remember that?
> A. He did come back into my room the second time. That's when he went out my door into the living room, and said, You never saw me. The first time he didn't say anything. He just showed me his gun.

{20} Even if Schindler's statement to the police had been inconsistent with her trial testimony, which counsel's question does not establish, the jury was free to find her trial testimony credible and to credit her photographic identification of Defendant as the gunman who entered her bedroom two different times.

{21} Relying solely on a police report that stated that Defendant had reportedly been kidnapped a few weeks before Kinter's death, Defendant speculates on appeal that someone arranged for him to be implicated in Kinter's shooting, that Defendant's kidnapping could have been part of the setup, that someone could have planted the murder weapon in his yard near where he was to be arrested, and that Kinter's true assailants could have influenced Schindler to falsely identify him. But no evidence Defendant or anyone else presented at trial established that anyone arranged for Defendant to be implicated or that his kidnapping was a key moment in the process or that people related to the assailants exercised undue influence in his identification.

Defendant was free to offer any evidence supporting those theories and to argue his alternative theories to the jury. But the jury and not this Court was the lawful factfinder, and this Court cannot substitute Defendant's speculations for the jury's verdict. This Court "will not invade the jury's province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] its judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (alterations in original) (internal quotation marks and citation omitted).

{22} Defendant also argues that the white cell phone found at the murder scene and the murder weapon found on the ground near him when he was arrested were not linked to him by scientific evidence. He points to the lack of any conclusive evidence that Defendant's deoxyribonucleic acid (DNA) was on either the cell phone or the firearm. He also relies on the absence of fingerprint evidence linking Defendant to either the cell phone or the firearm.

{23} Defendant cites no authority holding that the State was required to present conclusive DNA or fingerprint evidence. The State's duty was to present sufficient evidence for a jury to find beyond a reasonable doubt that Defendant committed the crimes. Here, the fact that trial evidence established that the firearm used in Kinter's shooting death was found on the ground near where police had just arrested

10

Defendant, combined with Schindler's photo identification of Defendant as the man who entered her bedroom holding a pistol, allowed the jury to find that Defendant possessed the pistol when he entered Kinter and Schindler's house.

{24} Defendant argues that the photo array shown to Schindler was impermissibly suggestive. To determine whether a photo array is impermissible, a court must determine "whether the photo array was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and, if so, under the totality of the circumstances, whether the identification was nonetheless reliable." *State v. Stampley*, 1999-NMSC-027, ¶ 14, 127 N.M. 426, 982 P.2d 477 (internal quotation marks and citation omitted).

{25} Defendant maintains, without providing evidence or other support, that the placement of his photo in the third position of a six-person array was highly suggestive. Defendant offered no support at trial for the suggestibility of the third position other than a question from his counsel to a detective on a proposed "psychological dynamic that people often go to number three" in a photo array, a hypothesis that the detective did not support. This unsupported suggestion of defense counsel has no evidentiary value and does nothing to establish that there was a substantial likelihood of irreparable misidentification.

{26} Defendant never objected to the admission of the photographic identification

at trial, and there was never any in-court identification of Defendant by Schindler. The only in-court identification that is linked to the photographic array is the identification done by a detective. The detective administered the photographic array, and when he testified at trial that Schindler had identified Defendant in the pretrial photographic array, there was no objection made by defense counsel.

{27}     We conclude that sufficient evidence supports Defendant's identification and convictions.

**B.     Defendant Has Not Established a Prima Facie Case of Ineffective Assistance of Counsel as a Result of Counsel's Not Attempting to Join Defendant's Two Separate Murder Prosecutions for a Joint Trial**

{28}     Defendant argues that his counsel was ineffective for not joining this case with a separate case in which Defendant was also charged with first-degree murder. In that case, Michael Garris was murdered in a separate home invasion less than twenty-four hours after Kinter was murdered. We have explained the factual background of Garris's murder and the procedural background and discussion of the legal issues in a separate decision filed on this date. *See State v. Suarez*, S-1-SC-36080. In that case, we rejected an identical ineffective assistance of counsel argument made by the appellate counsel representing Defendant in both appeals. For the sake of completeness of each of the two written decisions, we repeat our analysis here.

{29}     In *Arrendondo*, 2012-NMSC-013, ¶ 38, we summarized New Mexico

requirements for assessment of ineffective assistance of counsel claims on direct appeal:

> For a successful ineffective assistance of counsel claim, a defendant must first demonstrate error on the part of counsel, and then show that the error resulted in prejudice. The record is frequently insufficient to establish whether an action taken by defense counsel was reasonable or if it caused prejudice. Thus, instead of remanding the matter to the trial court, this Court prefers that these claims be brought under habeas corpus proceedings so that the defendant may actually develop the record with respect to defense counsel's actions. For this Court to remand to the trial court on this issue, the defendant must present a prima facie case of ineffective assistance of counsel. Without such prima facie evidence, the Court presumes that defense counsel's performance fell within the range of reasonable representation.

(internal quotation marks and citations omitted). With those principles in mind, we consider Defendant's claims of ineffective assistance of counsel to determine whether a prima facie case has been presented.

{30} Defendant contends that these two cases should have been joined to allow him the opportunity to present a theme common to both cases that he was framed by a gang for both murders. Defendant asserts both murder cases are tied together by his kidnapping and the theft of his cell phone two weeks before the murders occurred. He also asserts in support of his arguments that both cases arose under a single scheme of "homicides involving home invasions that seemed destined to end in the shooting of a male victim in the home he shared with his girlfriend."

13

{31} Defendant claims on appeal that he directed his trial counsel to join the two separate murder prosecutions for a joint trial. But he fails to cite any place in the record where such a claim is supported, in violation of Rule 12-318(A)(3) NMRA (requiring that appellate briefs "shall contain citations to the record proper, transcript of proceedings, or exhibits supporting each factual representation"). And our own independent review of the record finds nothing to support such a claim.

{32} Even if Defendant had made such a request of counsel, "'[a] prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct.'" *State v. Ortega*, 2014-NMSC-017, ¶ 55, 327 P.3d 1076 (quoting *Lytle v. Jordan*, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666). The record in this case is undeveloped with respect to any reasons why Defendant's counsel, who represented him in both murder cases, would have thought it tactically wise to join the two murder prosecutions for trial before the same jury. In fact, during a pretrial hearing in the separate Garris murder case, Defendant's counsel candidly acknowledged, "There's no link . . . between the two cases."

{33} The record is similarly undeveloped regarding whether the decisions by Defendant's counsel prejudiced him. To establish prejudice,

> a defendant must demonstrate that counsel's errors were so serious, such a failure of the adversarial process, that such errors undermine[] judicial confidence in the accuracy and reliability of the outcome. A defendant

14

must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289 (alteration in original) (internal quotation marks and citations omitted).

{34}     Defendant relies on *State v. Gallegos*, 2007-NMSC-007, ¶ 15, 141 N.M. 185, 152 P.3d 828, in quoting Rule 5-203(A) NMRA to argue that joinder of offenses "of the same or similar character" is required under the rule. He asserts that he was prejudiced by being "unable to introduce evidence from the other trial that would have demonstrated a pattern of events that would explain the evidence against [him]." He maintains that the jury's inability to hear both surviving eyewitnesses, Schindler and Glennda Trujillo, who respectively identified him as the murderer in the two cases, prevented Defendant from showing the unreliability of their testimony. Specifically, the jury in this case was unable to hear that Trujillo, the woman who implicated Defendant in the Garris murder, "did not immediately identify [Defendant] until she received a three-way phone call instructing her to do so." Defendant maintains that the jury was also deprived of hearing "the lies Ms. Trujillo told regarding her identity and her knowledge of the Garris murder." He similarly argues that the jury in the prosecution for Garris's murder did not hear Schindler's testimony regarding the cell phone that he now maintains on appeal was placed "as a prop at the murder scene" in

Kinter's house. We note that Defendant made no record in the district court that he attempted to introduce any relevant evidence related to the other murder case that might have helped establish such a defense theory in either trial.

**{35}** *Gallegos* held that a district court abuses its discretion in failing to sever offenses when the evidence pertaining to each charge would not have been cross-admissible. *See* 2007-NMSC-007, ¶ 20. In *State v. Lovett*, 2012-NMSC-036, 286 P.3d 265, this Court reversed a murder conviction because of prejudice, analyzing the cross-admissibility of evidence presented in two separate murder cases joined in a single trial for their prejudicial impact on the defendant. *See id.* ¶¶ 1, 9. In that case, Paul Lovett was charged with two counts of first-degree murder for the separate killings of Elizabeth Garcia and Patty Simon. *Id.* ¶¶ 2, 3, 7. We determined that photographs of Garcia's body presented as evidence at his joint trial were admissible "to illustrate, clarify and corroborate the testimony of witnesses concerning the scene of the crime, wounds of the victim and identity of" Garcia. *Id.* ¶ 34 (internal quotation marks and citation omitted). But that evidence would not have been admissible in a separate trial for Simon's murder. *Id.* Similarly, we determined that photographs of Simon's body, admissible to prove Simon's murder, would not have been admissible in a separate trial for Garcia's murder. *Id.* Accordingly, we concluded that those photographs did not "tend to show motive, opportunity, or any other relevant fact in

16

relation to the *other* murder, other than, perhaps, a propensity for violence, which is an impermissible purpose under our rules" of evidence. *Id.*

{36}     In this case, the same potential for inadmissibility of evidence of the other murder applies. The State presented photographs of Kinter's and Garris's bodies in each respective murder trial. Photographs of Garris's body were admissible at Defendant's trial for Garris's murder to corroborate witness testimony, the scene at his house, his wounds, and his identity. But those photographs would not have been admissible in a separate trial for Kinter's murder. Similarly, the photographs of Kinter's body would not have been admissible in a separate trial for Garris's murder. The potential for a jury to consider the photographs as evidence of Defendant's propensity for violence would have prejudiced him.

{37}     It is difficult to imagine a competent attorney making a deliberate choice to put the evidence of these two separate homicide prosecutions before the same jury, particularly in light of Defendant's central defense theory in both cases, not that the home invasions and murders did not occur but that he was not properly identified as the perpetrator. In each case Defendant's defense depended on challenging the credibility of a sole eyewitness. Permitting a jury to hear both eyewitnesses respectively describe Defendant as the person they saw commit two separate murders just hours apart, buttressed by the ballistics testimony that the pistol found on the

17

ground near Defendant when he was arrested was the same weapon used in both murders, would have strengthened the identifications of Defendant as the shooter in both cases.

{38} Whether there is any case that can be made for ineffective assistance of counsel in this case, the record before us certainly does not establish a prima facie case as is required for a reversal on direct appeal.

**C.  Defendant's Conviction and Concurrent Sentence for the Felony Murder Predicate Felony Violate Double Jeopardy Protections**

{39} Because Defendant was convicted of felony murder, his separate conviction of its predicate felony, aggravated burglary, violates the protection against double jeopardy guaranteed by the Fifth Amendment to the United States Constitution and Article II, Section 15 of the New Mexico Constitution. *See* U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."); N.M. Const. art. II, § 15 (providing for protection from double jeopardy); *see also* NMSA 1978, § 30-1-10 (1963) (providing that "[t]he defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment").

{40} In *State v. Frazier*, 2007-NMSC-032, ¶ 1, 142 N.M. 120, 164 P.3d 1, we held that "the predicate felony is always subsumed into a felony murder conviction, and no

18

defendant can be convicted of both." Accordingly, the Court in *Frazier* upheld the defendant's felony murder conviction but vacated his predicate felony kidnapping conviction as a lesser-included offense of felony murder. *See id.* In *State v. Montoya*, 2013-NMSC-020, ¶ 11, 306 P.3d 426, we recognized the propriety of the district court's vacating Montoya's predicate felony conviction, "leaving only the first-degree felony murder conviction, as required by New Mexico double jeopardy jurisprudence establishing that cumulative punishment may not be imposed for both felony murder and its lesser included predicate felony."

{41}    In this case, the jury appropriately found Defendant factually guilty of felony murder and of aggravated burglary, the separately charged predicate felony, but the district court entered convictions on both charges and imposed concurrent sentences. Our case law has emphasized that "concurrent sentencing does not adequately remedy the imposition of impermissible multiple punishments for a single offense; double jeopardy requires that the lesser offense merge into the greater offense such that the conviction of the lesser offense, not merely the sentence, is vacated." *State v. Santillanes*, 2001-NMSC-018, ¶¶ 28, 38, 130 N.M. 464, 27 P.3d 456 (remanding to the district court with instructions to vacate the convictions barred by double jeopardy).

{42}    We therefore direct the district court on remand to enter an amended judgment

19

and sentence vacating Defendant's aggravated burglary conviction.

**III.    CONCLUSION**

**{43}**    For the foregoing reasons, we affirm all of Defendant's convictions except aggravated burglary, which we direct the district court to vacate on remand in an amended judgment and sentence.

**{44}    IT IS SO ORDERED.**


_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**BARBARA J. VIGIL, Justice**


_____

**GARY L. CLINGMAN, Justice**