This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                            **No. A-1-CA-35099**

**JOSEPH GALLEGOS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Glenn T. Ellington, District Court Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Laurie Pollard Blevins, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kimberly M. Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**HANISEE, Judge.**

**{1}** Defendant Joseph Gallegos appeals his convictions for aggravated battery and child abuse. He challenges (1) numerous jury instructions, (2) the sufficiency of the evidence supporting his convictions, (3) the district court's handling of lost or missing evidence, and (4) the sentence imposed for his aggravated battery conviction. Concluding Defendant's arguments are all without merit, we affirm.

**BACKGROUND**

**{2}** Because this is a memorandum opinion and the parties are familiar with the facts and procedural history of this case, we set forth here only a brief overview of the historical facts of this case. We reserve discussion of specific facts where necessary to our analysis.

**{3}** On June 8, 2010, Defendant and his toddler-aged son (Child) went to an Española car wash where Yvonne Serrano was working. Yvonne's friend Renee Martinez was at the car wash visiting with Yvonne. Upon being introduced by Yvonne, Renee and Defendant decided to take Child to a nearby park, where they were joined by Gilbert Martinez (Victim) and Brenda Quesada. Later in the evening, Yvonne and her boyfriend, Martin Gonzales, joined the group. After cruising around, stopping at a liquor store, and picking up food from McDonald's, the group eventually returned to the car wash after it had closed, sometime around 9:45 p.m., and continued to socialize and consume alcohol.

**{4}** At some point after either hearing about or witnessing an altercation between Renee and Victim, Defendant confronted Victim, telling him, "You don't hit girls. You don't hit women. Why did you do that?" There were conflicting versions of how the ensuing fight began. Yvonne and Martin both testified that Defendant threw the first punch, which knocked Victim to the ground. Santa Fe Police Detective Brian Martinez testified that Defendant told him that Victim hit Defendant first, knocking him down, but that Defendant "got [in] what he called a lucky punch and watched [V]ictim go down." It was undisputed that the fight eventually moved from the parking lot of the car wash into the adjacent street and that Defendant continued to stomp and kick Victim, who was on the ground. Defendant then dragged Victim across the road and fled when he heard sirens.

**{5}** Victim was taken by paramedics to Española Hospital, where a helicopter was waiting to airlift Victim based on reports that Victim "had a lot of head trauma." Before Victim could be loaded into the helicopter, however, he went into cardiac arrest and was instead taken to the hospital's emergency room. The emergency room doctor who received and treated Victim later pronounced him dead.

**{6}** Defendant was charged with voluntary manslaughter, aggravated battery, tampering with evidence, and abuse of a child. Following trial, Defendant was acquitted of voluntary manslaughter and tampering with evidence, but convicted of

3

aggravated battery and child abuse. Defendant was sentenced to six years for aggravated battery and three years for child abuse. The district court ordered the sentences to run concurrently, less Defendant's presentence confinement credit, and ordered Defendant to complete two years of parole following his incarceration. From his convictions and sentence, Defendant appeals.

**DISCUSSION**

**I.      Jury Instructions**

**{7}**      Defendant argues that the district court erred by (1) denying Defendant's requested self-defense instruction, (2) improperly instructing the jury on child abuse, (3) improperly instructing the jury on proximate cause, and (4) failing to instruct the jury on how to evaluate expert opinions. Defendant asks this Court to conclude that cumulative error exists based on these instructional errors and reverse Defendant's convictions. We address each argument in turn.

**Standard of Review**

**{8}**      "The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo." *State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *State v. Cardenas*, 2016-NMCA-042, ¶ 5, 380 P.3d 866 (alteration, internal quotation marks, and citation

4

omitted). "While an accused is entitled to instruction on his theory of the case if evidence exists to support it, the court need not instruct if there is absence of such evidence." *State v. Gardner*, 1973-NMSC-034, ¶ 22, 85 N.M. 104, 509 P.2d 871.

{9} "The standard of review we apply to jury instructions depends on whether the issue has been preserved." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. "If the error has been preserved we review the instructions for reversible error. If not, we review for fundamental error." *Id*. (citation omitted). "Under both standards we seek to determine whether a reasonable juror would have been confused or misled by the instruction." *Id.* (internal quotation marks and citation omitted).

**A.      The District Court Properly Denied Defendant's Requested Self-Defense Instruction**

{10}      Defendant requested an instruction patterned after UJI 14-5181 NMRA (Self-defense; nondeadly force by the defendant), but the district court refused that instruction and instead instructed the jury under UJI 14-5171 NMRA (Justifiable homicide; self-defense). Defendant contends that the evidence, viewed in the light most favorable to giving the nondeadly force self-defense instruction, showed that Defendant used nondeadly force—to wit, "punching and kicking"—in defending himself against Victim. Defendant argues that this case is analogous to *State v. Romero*, 2005-NMCA-060, 137 N.M. 456, 112 P.3d 1113, where this Court held

5

that the district court erred in refusing the defendant's nondeadly force self-defense instruction. *Id*. ¶¶ 8, 9. We disagree.

{11} In *Romero*, the altercation between the defendant and the victim was an "attack, consisting of hitting, scratching, pinning down, and grabbing," which the Court said "allowed [the d]efendant to respond with the like force of hitting, punching, grabbing and biting." *Id.* ¶ 15. Notably the defendant and victim were husband and wife, and the evidence indicated that they had "fought physically . . . , made up, and fought again, after which they made up, made love, and fought again." *Id*. ¶¶ 2, 5. The Court described the victim's injuries, "in the light most favorable to [the d]efendant, [as] a broken nose, and various cuts and bruises." *Id*. ¶ 15. Critically in that case, the cause of the victim's death was disputed: the state's expert testified that "it was a complex case with no obvious cause of death" but nevertheless "opined that the victim died as a result of 'complications of mechanical injuries to the head,'" while the defense expert "testified that the victim died a natural or accidental death as a result of the liver condition [from which she suffered] because there was no other clear cause of death[.]" *Id*. ¶ 7. Under those circumstances and because the evidence in the light most favorable to the defendant "did not exclude an accidental death caused by the exercise of nondeadly force[,]" this Court concluded that the nondeadly force self-defense instruction should have been given. *Id*. ¶ 15.

6

{12} This case is distinguishable from *Romero*. First, the evidence viewed in the light most favorable to giving Defendant's requested instruction was that Victim initiated the fight by hitting Defendant first. However, Defendant admitted that *after* he got in "a lucky punch" that caused Victim to "go down" and "twitch[] like he was having a convulsion[,]" he proceeded to kick Victim in the face. Additionally, Martin testified that he saw Defendant repeatedly stomp and kick Victim while Victim was on the ground. Second, while there was testimony that Victim's injuries included "scrapes or superficial abrasions[,]" Victim's injuries were not mere "bruises and abrasions" as Defendant contends. Dr. Michelle Aurelius, a forensic pathologist with the Office of the Medical Investigator (OMI) and the State's expert witness, testified that Victim sustained numerous injuries all over his body, including multiple injuries to both sides of his head—e.g., a "contusion and swelling around his left eye"—as well as his mouth and chin, consistent with Defendant's admission to kicking Victim in the face. Finally, unlike in *Romero* where the victim's cause of death was disputed, Dr. Aurelius offered the only expert testimony in this case regarding Victim's cause of death, which she identified as "[c]omplications of multiple blunt force injuries[,]" and the manner of death, which she believed was homicide. Under the facts of this case, the district court properly refused Defendant's nondeadly force self-defense instruction because no reasonable jury could find that Defendant's acts of

7

continuing to kick Victim after Victim had already gone down—and in the absence of evidence indicating that Victim continued to be a threat to Defendant—to be reasonable. *See State v. Rudolfo*, 2008-NMSC-036, ¶ 20, 144 N.M. 305, 187 P.3d 170 ("If a court determines that a reasonable jury must find the defendant's use of . . . force to be unreasonable under the circumstances, a self-defense instruction is not appropriate.").

{13}     Defendant also complains about the district court instructing the jury under UJI 14-5191 NMRA (Self-defense; limitations; aggressor). In accordance with UJI 14-5191, the jury was instructed that:

> Self defense is not available to [D]efendant if he started the fight or agreed to fight unless:
>
> 1. [D]efendant was using force which would not ordinarily create a substantial risk of death or great bodily harm; and
>
> 2. [Victim] responded with force which would ordinarily create a substantial risk of death or great bodily harm.

The State requested this instruction because there was evidence that Defendant "started the fight" and "followed [Victim]" after Victim had walked away from Defendant, leading to a "subsequent altercation." The State argued that if the district court agreed to instruct the jury on self-defense, UJI 14-5191 was necessary in light of the evidence suggesting that Defendant may have been the aggressor. We fail to see, and Defendant fails to explain with citation to relevant authority, how the district court erred by giving this instruction under the facts of this case.

8

We, therefore, decline to consider this argument further. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are under no obligation to review unclear or undeveloped arguments); *State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 ("[A]ppellate courts will not consider an issue if no authority is cited in support of the issue and that, given no cited authority, we assume no such authority exists.").

**B.    The District Court's Child Abuse Instruction Did Not Improperly Include "Abandonment" as a Basis for Child Abuse**

{14}    Defendant argues that the jury instruction on child abuse "misdirected" the jury by allowing it to find that Defendant had committed the felony act of child abuse by completing the misdemeanor act of abandonment. *Compare* NMSA 1978, § 30-6-1(B) (2009) (providing that "abandonment of a child" is a misdemeanor offense if the child does not suffer death or great bodily harm), *with* § 30-6-1(E) (providing that "abuse of a child" is a felony offense). According to Defendant, "the jury was instructed on [the distinct] crimes [of child abuse and abandonment] in a single instruction, causing confusion[.]" As an initial matter, we conclude that Defendant failed to preserve this argument,[1] and we, therefore, review for

---

[1]Defendant points out that he proffered his own jury instruction on child abuse that the district court denied. However, we conclude that Defendant's proffer failed to preserve this issue because Defendant's proffered instruction failed to correctly state the law. *See State v. Baxendale*, 2016-NMCA-048, ¶ 11, 370 P.3d 813 ("Generally, to preserve error on a district court's refusal to give a tendered instruction, the defendant must tender a legally correct statement of law.").

fundamental error only. *See Benally*, 2001-NMSC-033, ¶ 12. However, even assuming arguendo that Defendant properly preserved this argument, there is still no reversible error based on the district court's instruction as to child abuse.

{15}     Section 30-6-1 separately defines and criminalizes "[a]bandonment of a child[,]" on the one hand, and "[a]buse of a child" on the other. *Compare* § 30-6-1(B) (providing that "[a]bandonment of a child consists of the parent . . . leaving or abandoning the child under circumstances whereby the child may or does suffer neglect"), *with* § 30-6-1(D) (providing that "[a]buse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished; or (3) exposed to the inclemency of the weather"). Here, Defendant was charged with and convicted of abuse of a child in violation of Section 30-6-1(D)(1), *not* abandonment of a child

Specifically, Defendant's instruction did not comply with and conform to the version of UJI 14-612 NMRA—which had been amended in April 2015, prior to Defendant's trial—in use at the time. First, Defendant's instruction was deficient in that it failed to describe the "conduct or course of conduct alleged to have been child abuse" as required by the first element of UJI 14-612. Instead, Defendant's instruction merely provided that Defendant "caused [Child] to be placed in a situation which endangered the life or health of [Child.]" Second, Defendant failed to properly define "reckless disregard" in conformance with the 2015 version of UJI 14-612—which provides that "reckless disregard" means "a substantial and unjustifiable risk of serious harm"—instead defining "reckless disregard" under the old standard of "substantial and foreseeable risk[.]" *Id.* Because Defendant failed to proffer a legally correct statement of child abuse, his argument that the court's instruction on child abuse was improper is unpreserved.

under Section 30-6-1(B). That abandonment has a misdemeanor application does not preclude its consideration as part of a sequence of acts endangering a child's life or health and thereby constituting felony child abuse. It is the nature of the defendant's act and the degree of risk to which a child is exposed by that act—not whether the act is denominated "abandonment"—that determines whether misdemeanor or felony liability exists.

{16}     In accordance with UJI 14-612 (Child abuse not resulting in death or great bodily harm), the State proffered four alternative factual bases for finding that Defendant committed child abuse under Subsection (D)(1): that Defendant (1) "had [Child] in a car driven by a person under the influence of intoxicating liquor," (2) "had [Child] present when people were using drugs," (3) "had [Child] present for an altercation," *or* (4) "abandoned [Child] from midnight to approximately six o'clock a.m. on June 9, 2010." The fourth alternative identifies a specific act and ensuing course of conduct over a period of hours—i.e., Defendant fleeing the scene upon hearing sirens, thus leaving Child in the middle of the night to be looked after by strangers who had been "drinking and partying" all day, if looked after by anyone at all as far as Defendant knew, and not retrieving Child for several hours—that the State sought to prove "placed [Child] in a situation that may have endangered [Child's] life or health[,]" i.e., constituted a violation of Section 30-6-1(D)(1). Though the term "abandoned" was used in instructing the jury on child

11

abuse, we conclude that the jury would not have been misdirected or confused by the instruction as given for two reasons. First, the jury was neither instructed on the misdemeanor crime of "abandonment of a child"—for which a different uniform jury instruction exists, *see* UJI 14-607 NMRA—nor provided a definition of "abandoned" premised upon its non-felony application. As such, we assume the jury would have given the term "abandoned" as used in the instruction its ordinary meaning and understood it to refer to Defendant's act of fleeing the scene, leaving Child in precarious and uncertain circumstances, and failing to regain custody of Child for many hours. *Cf. State v. Gonzales*, 1991-NMSC-075, ¶ 30, 112 N.M. 544, 817 P.2d 1186 (noting that "definitional instructions are not required when the terms are used in their ordinary sense"). Second, and relatedly, because it is clear from the context of the evidence presented at trial that "abandoned" referred to the aforementioned specific actions which the State argued constituted child abuse, we are satisfied that the jury here was not misdirected as to the standard that had to be met in order to convict Defendant of felony child abuse rather than misdemeanor abandonment.

**C.    The District Court Properly Instructed the Jury on Proximate Cause and Negligence of a Third Party**

{17}    The jury was given an instruction patterned after UJI 14-251 NMRA (Homicide; "proximate cause"; defined), which instructed it that in order to hold Defendant responsible for Victim's death, it had to find that Defendant's act "was

12

a significant cause of the death of [Victim,]" meaning that Defendant committed "an act which, in the natural and continuous chain of events, uninterrupted by an outside event, resulted in the death and without which the death would not have occurred." UJI 14-251 contains bracketed language—"[There may be more than one significant cause of death. If the acts of two or more persons significantly contribute to the cause of death, each act is a significant cause of death.]"—that is to be given "if there is evidence that the acts of more than one person contributed to the death of the victim." *Id.* use note 4. Defendant proffered an instruction omitting the bracketed language, which the district court rejected in favor of the State's requested instruction that included the language.

{18} Notably, it was Defendant who advanced the theory that "more than one person" contributed to Victim's death and that Defendant did not act alone. In closing argument, Defendant recalled the testimony of an eyewitness who was not part of the group at the car wash but who was nearby and testified that she saw "four guys and a girl kicking and jumping on another guy who was laying [sic] on the ground and looked unconscious." Defendant also referred to the testimony of numerous officers who explained that they were responding to calls of "a large fight." Defendant specifically argued in summation that "[n]one of those . . . officers responded to two men fighting or one man dragging [another]. It's a large fight." In other words, Defendant attempted to cast doubt by positing that "more

13

than one person" participated in the beating of Victim. *See* UJI 14-251, use note 4. Thus, it was not only appropriate but necessary to include the bracketed language in order for the jury to understand the meaning of "significant cause" where the evidence could be construed as supporting a finding that Defendant's acts were not the sole cause of Victim's death. [2] *See State v. Huber*, 2006-NMCA-087, ¶ 13, 140 N.M. 147, 140 P.3d 1096 (explaining that "[b]ecause there was evidence that [the d]efendant was not the only one involved in the beating," the jury was additionally instructed with the bracketed language in UJI 14-251).

_____

[2]We note that the district court premised its ruling regarding UJI 14-251 on the fact that there was "testimony before the [j]ury that there was intervening conduct of others, which may have resulted in [Victim's] death," referring to the possible improper intubation of Victim by paramedics. Defendant's argument on appeal regarding UJI 14-251 likewise focuses on the issue of whether "a temporally subsequent, third party action[,]" i.e., improper intubation, may have been a cause of Victim's death. However, the record demonstrates that it was not the evidence of improper intubation that supported the use of the bracketed language but rather the aforementioned evidence regarding the possibility of multiple assailants that necessitated its inclusion. Because we may "affirm the [district] court's decision if it was right for any reason so long as it is not unfair to the appellant[,]" *State v. Ortega*, 2014-NMSC-017, ¶ 7, 327 P.3d 1076 (internal quotation marks and citation omitted), we conclude that it matters not that the district court did not identify the proper basis for including the bracketed language because the record undisputedly provides it. *See State ex rel. State Highway Dep't v. Strosnider*, 1987-NMCA-136, ¶ 17, 106 N.M. 608, 747 P.2d 254 (explaining in the context of a challenge to jury instructions that "a correct decision of the [district] court will not be reversed if under any reasonable view of the facts and law, the judgment is proper").

14

**{19}** Defendant's related complaint that the giving of UJI 14-252 NMRA (Homicide; negligence of deceased or third person) further confused matters is equally unavailing. UJI 14-252 provides:

> The State must prove beyond a reasonable doubt that the defendant's act was a significant cause of the death of _____ (*name of victim*). Evidence has been presented that the negligence of a person other than the defendant may have contributed to the cause of death. Such contributing negligence does not relieve the defendant of responsibility for an act that significantly contributed to the cause of the death so long as the death was a foreseeable result of the defendant's actions. However, if you find the negligence of a person other than the defendant was the only significant cause of death, then the defendant is not guilty of the offense of _____ (*name of offense*).

UJI 14-252 is to be used "in conjunction with [UJI] 14-251 when there is evidence of negligence by another person." UJI 14-252 use note. Here, unlike with respect to the bracketed language in UJI 14-251, it was the district court's determination that "[c]ausation is in issue[,]" coupled with the evidence of possible negligence by the paramedics, that supported giving UJI 14-252.

**{20}** Defendant called Dr. Valerie Merl, the emergency room doctor who treated Victim, and elicited testimony from her tending to suggest that the paramedics who treated Victim on the way to the hospital may have improperly intubated Victim. While Dr. Merl was not qualified as an expert witness and was not allowed to offer an opinion regarding Victim's cause of death, she was allowed to testify, over the State's objection, that when she learned later what Victim's cause of death was

15

determined to be, it was different than the conclusion she had reached "of what [she] thought his cause of death would be." Understood in context, Dr. Merl's testimony was clearly intended as evidence that the paramedics, acting negligently by improperly intubating Victim, may have been a contributing cause of Victim's death. Thus, in order to ensure that the jury would *not* be confused as to the impact of that evidence, it was necessary and proper for the district court to instruct the jury under UJI 14-252.

**D.      The District Court Did Not Commit Fundamental Error in Failing to Instruct the Jury on How to Evaluate Expert Opinions**

{21}      Defendant argues that the district court's failure to give UJI 14-5050 NMRA (Opinion testimony) constitutes fundamental error. We disagree.

{22}      UJI 14-5050 instructs the jury that it "should consider each opinion received in evidence . . . and give it such weight as [the jury] think[s] it deserves" and that it "may disregard the opinion entirely" if it "conclude[s] that the reasons given in support of the opinion are not sound or that for any other reason an opinion is not correct[.]" *Id.* The use note provides that the instruction may be given "[u]*pon request . . .* whenever an expert has testified or when a layman has been allowed to state an opinion." *Id*. use note (emphasis added).

{23}      Defendant did not request an instruction under UJI 14-5050. Defendant's only argument on appeal regarding why it was fundamental error for the district court to fail to give a non-mandatory instruction that Defendant never requested is

16

that "[t]he guidance of UJI 14-5050 was critical to this case where [the State's] expert['s] opinion constitutes the primary evidence of the State's theory of [Defendant] being a proximate cause of death." That is simply insufficient to establish fundamental error. *See State v. Cabezuela*, 2015-NMSC-016, ¶ 37, 350 P.3d 1145 ("The exacting standard of review for reversal for fundamental error requires the question of guilt be so doubtful that it would shock the conscience of the court to permit the verdict to stand." (alterations, internal quotation marks, and citation omitted)); *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633 ("The doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice."). Defendant fails to explain how the district court's failure to instruct under UJI 14-5050—particularly where it had already instructed under UJI 14-5020 NMRA (instructing the jury regarding the credibility of witnesses, including that the jury is the sole judge "of the credibility of the witnesses and the weight to be given to the testimony of each of them")—constitutes a miscarriage of justice. We, therefore, decline to consider this issue further. *See Guerra*, 2012-NMSC-014, ¶ 21.

**E.     No Cumulative Error Exists**

{24}     "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *See State v. Roybal*, 2002-

17

NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. Because we have concluded that no error exists in either the instructions given or the district court's refusal or failure to give certain instructions, there can be no cumulative error.

**II.     Sufficient Evidence Supports Defendant's Convictions**

**{25}**     Defendant argues that his conviction for child abuse and the jury's finding that he was a significant cause of Victim's death are not supported by sufficient evidence. We address each argument in turn.

**Standard of Review**

**{26}**     "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citation omitted). We do not "evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *Id.* (internal quotation marks and citation omitted). Rather, we "view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict while at the same time asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]" *Id.* (emphasis, internal quotation marks, and citation omitted).

**A.     Sufficient Evidence Supports Defendant's Conviction for Child Abuse**

18

{27} Defendant argues that there is insufficient evidence to support his conviction for felony child abuse under Section 30-6-1(D)(1). Section 30-6-1(D)(1) provides that "[a]buse of a child consists of knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health[.]" In order for a given instance of child abuse to rise to the felony level with which Defendant was charged, the risk to the child created by Defendant's conduct must be substantial and unjustifiable. *See* UJI 14-612 (providing that in order to find a person guilty of child abuse, the state must prove that the defendant "[caused] [or] [permitted] a substantial and unjustifiable risk of serious harm to the safety or health of [the child]" (footnote omitted)).

{28} As noted previously, the jury was instructed that it could convict Defendant of child abuse if it found that Defendant committed any of four specified acts—(1) "ha[ving] [Child] in a car driven by a person under the influence of intoxicating liquor," (2) "ha[ving] [Child] present when people were using drugs," (3) "ha[ving] [Child] present for an altercation," *or* (4) "abandon[ing] [Child] from midnight to approximately six o'clock a.m. on June 9, 2010"—with "reckless disregard for the safety or health of [Child]." In accordance with UJI 14-612, the jury was instructed that to find that Defendant showed a reckless disregard, it "must find that [Defendant] caused or permitted a substantial and unjustifiable risk

19

of serious harm to the safety or health of [Child]." It was further instructed that "[a] substantial and unjustifiable risk is one that any law-abiding person would recognize under similar circumstances and that would cause any law-abiding person to behave differently than [Defendant] out of concern for the safety or health of [Child]." Thus, to support Defendant's conviction for child abuse, there must be evidence of at least one of the four acts the State alleged constituted child abuse *and* that Defendant showed reckless disregard for the safety or health of Child in committing that particular act.[3] *See* UJI 14-612; *State v. Duttle*, 2017-NMCA-001, ¶ 33, 387 P.3d 885 (explaining that a "general verdict will not be disturbed if there is substantial evidence in the record to support at least one of the theories of the crime presented to the jury").

---

[3]Ordinarily, courts reviewing the evidence supporting a conviction for child abuse by endangerment do not "parse[] the testimony [or] view[] the verdict only in light of the probative value of individual pieces of evidence." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285. Rather, we consider the cumulative effect of the evidence in light of the totality of the circumstances upon which the charge of child abuse is premised. *See State v. Chavez*, 2009-NMSC-035, ¶¶ 30-31, 146 N.M. 434, 211 P.3d 891 (discussing *State v. Jensen*, 2006-NMSC-045, 140 N.M. 416, 143 P.3d 178, and explaining how certain conduct—to wit, exposing a child to filthy living conditions—may, in combination with other risks, constitute child abuse by endangerment, but how that same conduct in isolation does not, unless the state adduces evidence of reckless disregard, i.e., that the filthy conditions placed the child at risk of substantial and foreseeable harm). However, because the jury was instructed exclusively in the disjunctive with four alternative premises, we proceed by determining whether there was sufficient evidence to support the conclusion that any one of the alternatives, rather than the combination of acts, constituted child abuse by endangerment. *See State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured.").

{29} Our review of the record leads us to conclude that there was sufficient evidence to convict Defendant of child abuse based on Defendant's act, and the associated circumstances, of "abandon[ing] [Child] from midnight to approximately six o'clock a.m. on June 9, 2010." Defendant contends that "there is no evidence that [Defendant] 'abandoned' [Child] at all, much less that any such abandonment *recklessly endangered* [Child] as is required for [child] abuse." We disagree.

{30} As concluded previously, in the context of the instruction—which specified a period of abandonment from midnight to six o'clock the next morning—and the totality of the evidence presented, a reasonable juror would have understood "abandoned" to refer to Defendant's act of fleeing the scene after the fight and ceasing to provide for the safe care of Child during the specified period of time. The record contains substantial evidence of this act and its associated circumstances, comprising testimony that Defendant indeed fled the scene *without* Child, a toddler, and *without* providing for or acquiring means for Child's care; that Defendant only retrieved Child upon being contacted by Renee hours later; and the reasonable inference that Defendant had no idea of Child's whereabouts or condition for the entire period from when Defendant fled until Renee contacted him. We note that there is no evidence that Defendant returned to the car wash to check on Child, made arrangements for a sober, familiar person to look after Child,

21

or took any other action to promote Child's safety after fleeing the scene. In other words, there is substantial evidence supporting the first element of child abuse: that Defendant committed the act that the State alleged constituted felony child abuse, i.e., abandoning Child. *See* UJI 14-612.

{31} The next question, then, is whether the evidence supports the jury's finding that Defendant showed "reckless disregard" in abandoning Child. The jury heard that Defendant and Child had spent the day and night with a group of people who had been "drinking and partying all day[,]" including consuming alcohol and drugs. While Defendant had met Yvonne on one previous occasion when he repaired her tire, Defendant had never met the others in the group. Defendant, Renee, Brenda, and Child spent time at a park "where[,] later on that evening[,] Martin and Yvonne show[ed] up with *more* alcohol." (Emphasis added.) At some point after nine o'clock at night, the group, with Child in tow, went to a liquor store where they purchased yet more alcohol. After picking up food at McDonald's, the group ended up at the closed car wash at around ten o'clock, where they proceeded to consume the alcohol they had purchased and where at least some members of the group went to the bathroom "to snort pills[.]" Sometime shortly before midnight, Defendant and Victim got into a fight. After Defendant hit Victim, causing Victim to "go down" and "twitch[] like he was having a convulsion[,]" Defendant continued kicking Victim, dragged Victim across the

22

street, then "took off running" when he heard sirens. We conclude that a reasonable jury could find that Defendant's act of fleeing the car wash without Child under the aforementioned circumstances—i.e., leaving Child, in the middle of the night, at a closed place of business, with virtual strangers who had been drinking and doing drugs—"caused or permitted a substantial and unjustifiable risk of serious harm to the safety or health of [Child]" such that "any law-abiding person would recognize under similar circumstances and that would cause [such] person to behave differently than [Defendant]." In other words, the jury could find that Defendant, through his conduct, showed reckless disregard for the life and health of Child. We, therefore, affirm Defendant's conviction for child abuse.

**B.     The State Produced Sufficient Evidence that Defendant's Conduct Was a Significant Cause of Victim's Death**

{32}     The jury was given a special verdict form asking it to answer the question, "If you unanimously find . . . that [Defendant] is guilty of [a]ggravated [b]attery with great bodily harm, do you unanimously find . . . that [Defendant's] actions were a significant cause of the death of [Victim]?" The jury answered this question, "Yes[.]" Defendant argues that "the evidence was insufficient to support the jury's special interrogatory finding that [Defendant's] conduct was a 'significant' cause of death." We disagree.

{33}     Defendant's entire argument under this issue is premised on his mistaken view that Dr. Aurelius's testimony regarding Victim's cause of death was the only

23

evidence supporting the jury's finding that Defendant's acts were a significant cause of Victim's death. Defendant's argument ignores the other evidence, unrelated to Dr. Aurelius, supporting the jury's finding. Specifically, Martin testified that he saw Defendant repeatedly stomping and kicking Victim when Victim was already on the ground, causing Martin to implore Defendant to "[p]lease stop. Stop. Look at what you're doing. He's already out of it[.]" He also testified that Defendant then dragged Victim's body out of the roadway. Yvonne testified that Victim "was unrecognizable" because "[t]here was blood everywhere" on Victim's face. Investigating detectives testified that when they found Victim in a shed at a nearby business, Victim was breathing with slow, shallow breaths. When paramedics arrived, Victim was responsive to painful stimuli but was not talking or opening his eyes. The local hospital prepared a helicopter to airlift Victim to another location where a neurosurgeon would be available due to reports from dispatch that Victim had "a lot of head trauma."

{34}     Additionally, Dr. Aurelius, who was qualified to testify as an expert and who participated in reaching a conclusion regarding the cause and manner of Victim's death, testified "to a medical certainty" that Victim's cause of death was complications from multiple blunt force injuries and identified Victim's manner of death as homicide. Conceding that the injuries Victim suffered "were such that they did not have a direct tear in the brain" and that the bleeding caused by the

24

scrapes and lacerations "in isolation with blood loss alone[] would not have been able to account for [Victim's] death[,]" Dr. Aurelius explained that "in interpreting the information from the scene that [Victim] was struck in the face, went down immediately and started to convulse, and then emergency medical services arrived, that it's that sequence of events that links it to the death at the hands of another." She further explained that her "determination for cause of death is that [Victim] died from complications of blunt force injury with the concerns that he wasn't able to protect his airway from the vomiting and the inhalation of blood."

{35} From the foregoing, we conclude that there was substantial evidence to support the jury's finding that Defendant was a significant cause of Victim's death.

**III. The District Court Properly Addressed Defendant's Complaints Regarding Lost or Destroyed Evidence and Did Not Err by Not Instructing the Jury on Lost or Destroyed Evidence**

{36} Defendant argues that he was "prejudiced by the State's loss of critical evidence" and that his convictions must be reversed because "the [district] court failed to provide the remedy [relating to the lost evidence that] it had granted pretrial." Specifically, Defendant complains that the district court rejected his proffered jury instructions on lost or destroyed evidence, which would have instructed the jury that it "may infer that the lost . . . evidence is unfavorable to the [S]tate's case against . . . [D]efendant." While Defendant initially complained of and sought a remedy for the State's loss of or failure to disclose three pieces of

25

evidence—(1) Yvonne's recorded statement to police on the night of the incident, (2) the "original notes or reports made in 2010" during Victim's autopsy, and (3) the police reports of Lieutenant Christian Lopez, who responded to and investigated the June 8 incident, that purportedly documented "that [Victim's] death was not due to a battery" but rather may have occurred at the hands of the paramedics—Defendant develops an argument only as to Lieutenant Lopez's lost reports. We, therefore, limit our discussion to the issue of Lieutenant Lopez's lost reports and the district court's rulings regarding that evidence. *See Guerra*, 2012-NMSC-014, ¶ 21; *cf. Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (alteration, internal quotation marks, and citation omitted)).

**Remedies for Lost or Destroyed Evidence**

{37}    "We review a district court's remedy for lost or destroyed evidence for an abuse of discretion." *State v. Redd*, 2013-NMCA-089, ¶ 18, 308 P.3d 1000. New Mexico courts apply a three-part test for determining whether a defendant's due process rights have been violated—and, concurrently, what sanction or remedy is appropriate—when the state "destroys, loses, or fails to preserve evidence that has previously been collected during the investigation of a crime." *State v. Ware*, 1994-NMSC-091, ¶ 15, 118 N.M. 319, 881 P.2d 679; *see State v. Chouinard*, 1981-NMSC-096, ¶ 16, 96 N.M. 658, 634 P.2d 680 ("New Mexico has adopted a three-

26

part test to determine whether deprivation of evidence is reversible error."). The test considers whether (1) the state "either breached some duty or intentionally deprived the defendant of evidence[,]" (2) the lost or destroyed evidence is material, and (3) the defendant suffered prejudice as a result of the "suppression" of the material evidence. *Chouinard*, 1981-NMSC-096, ¶ 16 (internal quotation marks and citation omitted). Courts are to apply "a pragmatic balancing approach" by "[w]eigh[ing] the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at the trial in order to come to a determination that will serve the ends of justice." *Id.* ¶ 13 (internal quotation marks and citation omitted); *see Redd*, 2013-NMCA-089, ¶ 24 ("The purpose of this test is to assure that the district court arrived at a determination that will serve the ends of justice.").

{38}    The remedy selected—e.g., "[e]xclusion of all evidence which the lost evidence might have impeached, or admission with full disclosure of the loss and its relevance and import[,]" *Chouinard*, 1981-NMSC-096, ¶ 23—must be commensurate with and reflect the conclusion reached through the balancing of the factors. *See id.* ("The choice between these alternatives must be made by the trial court, depending on its assessment of materiality and prejudice."); *cf. Ware*, 1994-NMSC-091, ¶ 26 (describing the different remedies available depending on whether a failure to collect evidence was "done in bad faith," constituted "gross[]

27

negligen[ce,]" or was "merely negligent, an oversight, or done in good faith"). "Determination of materiality and prejudice must be made on a case-by-case basis." *Chouinard*, 1981-NMSC-096, ¶ 25. "The importance of the lost evidence may be affected by the weight of other evidence presented, by the opportunity to cross-examine, by the defendant's use of the loss in presenting the defense, and other considerations." *Id.* Thus, "even if all three requirements of the . . . test are met, [imposition of a remedy] does not necessarily flow as a matter of course." *Scoggins v. State*, 1990-NMSC-103, ¶ 9, 111 N.M. 122, 802 P.2d 631. The unavailable evidence "must in some way have been determinative of guilt" in order to lead to reversible error where no remedy is provided. *Id.* (internal quotation marks and citation omitted).

**The District Court's Rulings**

{39}    In a pretrial hearing, the district court found the loss of Lieutenant Lopez's reports to constitute "gross negligence on the part of the State." It, therefore, ruled that Lieutenant Lopez would "be allowed to testify as to the contents of that report and his investigation and communications about the circumstances surrounding the investigation and ultimately the death of the purported victim in this case and also his efforts to document and how he documented his investigation and report and the fact that it no longer exists." The district court additionally indicated that it "would allow the submission of appropriate language to alert the jury as to those

28

problems *if that testimony is indeed elicited during trial . . .* and then give the proper instructions." (Emphasis added.)

{40} At trial, defense counsel elicited testimony from Lieutenant Lopez regarding the standard process for writing and filing police reports and that despite saving both reports he wrote in this case on his computer, neither was "in the case file." Lieutenant Lopez testified that he had written a report documenting his investigation as well as a supplemental report based on conversations he had with "the pathologist from [OMI]" and the district attorney's office on the day after the incident. While he was not allowed to repeat the statements made to him by the pathologist and the district attorney based on the State's hearsay objection, Lieutenant Lopez was allowed to testify that he relayed the information he received in those conversations to Detective Martinez. Detective Martinez, in turn, testified that after speaking with Lieutenant Lopez, he amended the charges that had originally been filed against Defendant. Based on the State's objection as to relevance, Lieutenant Lopez was also not allowed to answer defense counsel's question, "So was there, at any point, any other person or entity that you wanted to pursue investigating or filing charges against?" However, the district court allowed Lieutenant Lopez to answer whether anyone else had been charged in connection with Victim's death, to which Lieutenant Lopez answered, "No." Regarding the

contents of the missing reports, Lieutenant Lopez was never asked any questions by either defense counsel or the State.

{41} During the jury instruction conference, defense counsel represented to the district court that "the remedy that the [c]ourt selected for [the lost or missing] evidence was that [Defendant] would be given the chance to instruct the jury on that. That was the specific remedy, as opposed to suppressing the evidence or anything touching on the evidence." The district court did not "recall any statement that [the jury] would be instructed on the loss of that information[,]" but rather remembered ruling that it "was going to allow [Defendant] to develop all of the testimony about evidence that was collected at the time of the incident, and then subsequently lost, and also to have the opportunity to argue to the [j]ury on a general theory or whatever theory [Defendant] like[s] as to reasonable doubt, that that information, if it was before the [j]ury, may exculpate him from the alleged charges in the case." After confirming the accuracy of its recollection by listening to a recording of the pretrial hearing, the district court denied Defendant's requested instructions.

**The District Court Properly Denied Defendant's Requested Instruction Regarding Lieutenant Lopez's Lost Reports**

{42} Defendant argues that the district court erred because it failed to "consider[] the merits of the defense request anew" and instead "simply rejected the instruction[] as not having been granted previously." We conclude that the record

30

does not support this characterization of the district court's ruling and that the district court properly denied Defendant's instruction because Defendant failed to establish (1) the materiality of the lost evidence, and (2) that he was prejudiced by its unavailability. We briefly explain.

{43}     The record evinces that the district court appreciated that it should *consider* an instruction to the jury regarding Lieutenant Lopez's lost reports as a *possible* alternative remedy instead of excluding evidence or dismissing charges as Defendant originally requested. The district court stated that it "would allow the submission of appropriate language to alert the jury as to those problems *if that testimony is indeed elicited during trial . . .* and then give the proper instructions." (Emphasis added.) At best, then, the district court indicated a contingent agreement to instruct the jury on lost evidence should Defendant meet his burden to establish entitlement to the instruction.

{44}     Defendant appears to believe that the mere fact that Lieutenant Lopez testified that his reports were lost was enough to entitle Defendant to a lost-or-destroyed evidence instruction. But that is not what *Chouinard* and its progeny instruct. A defendant who seeks a lost-or-destroyed evidence instruction must also establish that the lost evidence is material, i.e., in some way "determinative of guilt[,]" *Scoggins*, 1990-NMSC-103, ¶ 9 (internal quotation marks and citation omitted), and further that he or she is prejudiced by the suppression of the material

31

evidence. Where the defendant fails to establish both the materiality of the lost evidence and that its absence from trial resulted in prejudice, it is not reversible error if the district court provides no remedy. *See Chouinard*, 1981-NMSC-096, ¶¶ 24, 26 (explaining that "where the state shows it did not act in bad faith, the defendant must show materiality and prejudice" and concluding in that case that the district court did not abuse its discretion by denying the defendant's motion to dismiss where there was not "a realistic basis, beyond extrapolated speculation, for supposing the availability of the lost evidence would have undercut the prosecution's case").

{45}     On the record before us, we are unable to conclude that the district court abused its discretion in refusing Defendant's requested lost-evidence instruction in light of the evidence presented at trial. Defendant's primary theory of the case was that it was not his admitted actions of beating Victim but rather the negligence of the paramedics responding to the 911 call (i.e., possible improper intubation of Victim) that caused Victim's death. Through the testimony of Dr. Merl and Dr. Aurelius, Defendant was able to develop his theory, even in the absence of Lieutenant Lopez's reports. Dr. Merl testified that she reintubated Victim because she "could not verify where [the original breathing tube] was." While she initially thought the tube was properly placed, she "couldn't be . . . sure[,] [s]o [she] . . . reintubated him." On cross-examination, Dr. Aurelius testified that "[t]here was a

32

note [in the OMI file with] a question about a physician who had called [OMI] and . . . said that there were problems with intubation in the field, and that the physician had questions about where the tube was located[.]" However, Dr. Aurelius further testified on redirect examination that based on the beating Victim sustained and the symptoms he had prior to any medical intervention, it would have been her expectation that Victim "would have expired and died . . . if he had not gotten help."

{46}     Defendant fails to explain how the absence of Lieutenant Lopez's reports— which Defendant describes as "explain[ing] [Lieutenant Lopez's] decision not to charge [Defendant] with [Victim's] death"—was in any way determinative of Defendant's guilt and prejudiced him. In light of the foregoing evidence, we cannot say the district court abused its discretion in refusing to give Defendant's remedial lost-evidence instruction based on what we understand to be the district court's determination that Defendant failed to establish that Lieutenant Lopez's lost reports were material and that the suppression of those reports prejudiced him. *See Chouinard*, 1981-NMSC-096, ¶ 25 ("The importance of the lost evidence may be affected by the weight of other evidence presented, by the opportunity to cross-examine, by the defendant's use of the loss in presenting the defense, and other considerations."); *Redd*, 2013-NMCA-089, ¶ 31 ("When evaluating prejudice, we examine the importance of the missing evidence to the defendant and the strength

33

of the other evidence of the defendant's guilt." (alterations, internal quotation marks, and citation omitted)).

**IV. The District Court Properly Sentenced Defendant to Six Years' Imprisonment Based on His Aggravated Battery Conviction**

{47} Defendant argues that the district court imposed an illegal sentence of six years for Defendant's aggravated battery conviction. Defendant contends that the maximum basic sentence for aggravated battery, a third degree felony, is three years' imprisonment. *See* NMSA 1978, § 30-3-5(C) (1969) (providing that "[w]hoever commits aggravated battery inflicting great bodily harm . . . or . . . in any manner whereby . . . death can be inflicted is guilty of a third degree felony"), NMSA 1978, § 31-18-15(A)(11) (2016) (providing that the basic sentence "for a third degree felony" is "three years imprisonment"). While Defendant acknowledges that Section 31-18-15(A)(8) provides that the basic sentence "for a third degree felony resulting in the death of a human being" is six years' imprisonment *and* that the jury here returned a special verdict finding that Defendant's "actions were a significant cause of the death of [Victim,]" Defendant argues that "[t]he Legislature intended to reserve the six-year sentence for crimes designated as a 'third degree felony resulting in the death of a human being[]' in [Section 31-18-15(A)(8)]." In other words, under Defendant's reading of Section 31-18-15(A)(8), the basic sentence of six years is intended to apply in the case of someone convicted of voluntary manslaughter, statutorily designated as "a third

degree felony resulting in the death of a human being," NMSA 1978, § 30-2-3(A) (1994), but not in the circumstances of this case, where Defendant was acquitted of voluntary manslaughter. Defendant's interpretation of the applicability of Section 31-18-15(A)(8) ignores basic rules of statutory construction, disregards a long line of precedential case law, and is unavailing.

{48} Whether the district court should have sentenced Defendant under Section 31-18-15(A)(8) or (A)(11) involves a question of statutory construction, which we review de novo. *See State v. Juan*, 2010-NMSC-041, ¶ 37, 148 N.M. 747, 242 P.3d 314. "The principal command of statutory construction is that the court should determine and effectuate the intent of the [L]egislature using the plain language of the statute as the primary indicator of legislative intent." *Id.* (internal quotation marks and citation omitted). "[W]here the meaning of the statutory language is plain, and where the words used by the Legislature are free from ambiguity, there is no basis for interpreting the statute." *State v. Shije*, 1998-NMCA-102, ¶ 6, 125 N.M. 581, 964 P.2d 142 (internal quotation marks and citation omitted). "The plain meaning rule requires that statutes be given effect as written without room for construction unless the language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, in which case the statute is to be construed according to its obvious spirit or reason." *State v.*

35

*Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830 (internal quotation marks and citation omitted).

{49} As noted above, Section 31-18-15(A)(8) provides that "the basic sentence of imprisonment . . . for a third degree felony resulting in the death of a human being[ is] six years imprisonment[.]" By its plain language, the statute does not limit the six-year sentence to "crimes designated as" a third degree felony resulting in the death of a human being as Defendant suggests. To so construe the applicability of Subsection (A)(8) would require that we read the words "crimes designated as" into the statute, something we will not do. *See State v. Benally*, 2015-NMCA-053, ¶ 7, 348 P.3d 1039 ("We will not read language into the statute that is not there, especially when the statute makes sense as written." (alteration, internal quotation marks, and citation omitted)). It would also require that we ignore our Supreme Court's interpretation of Section 31-18-15's two-tiered basic sentencing structure. *See State v. McDonald*, 2004-NMSC-033, ¶ 7, 136 N.M. 417, 99 P.3d 667 (construing a previous, but materially comparable, version of Section 31-18-15 and explaining that the statute's language evinced that "the [L]egislature has chosen one basic sentence for generic second and third degree felonies, and a different basic sentence with a greater penalty when an additional fact is found: a crime 'resulting in death' "). Finally, it would establish a rule that runs counter to the obvious reason the Legislature enacted that two-tiered system: to punish more

36

harshly acts that result in another person's death. Rather than leading to an "absurd result" or a "miscarriage of justice" as Defendant argues, reading Section 31-18-15 to impose a longer sentence when a person's "unlawful touching or application of force to the person of another with intent to injure[,]" § 30-3-5, i.e., aggravated battery, results in the other person's death rather than merely great bodily harm, is consistent with both the plain language of and purpose underlying the statute. The district court properly sentenced Defendant to six years' imprisonment for committing an aggravated battery that resulted in the death of a human being.

**CONCLUSION**

{50}     For the foregoing reasons, we affirm Defendant's convictions and sentence.

{51}  **IT IS SO ORDERED.**


_____
                                                    **J. MILES HANISEE, Judge**

**WE CONCUR:**


_____
**M. MONICA ZAMORA, Chief Judge**


_____
**JULIE J. VARGAS, Judge**

38